[No. D034739. Fourth Dist., Div. One. Aug. 28, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
VERNON LEROY BARKER, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I.B, I.C and II.

COUNSEL

Kimberly J. Grove, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Janelle Boustany and Bradley A. Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**HUFFMAN, Acting P. J.**—Following his convictions of first degree murder and robbery, Vernon Leroy Barker appeals, asserting that the trial court (1) improperly instructed the jury they could convict him of murder based only upon his possession of property stolen from the victim and "slight" corroborating evidence, (2) erroneously failed to give the jury an instruction on the lesser included offense of theft, (3) prejudicially erred by instruction of the jury on their duty to deliberate, and (4) erroneously imposed a parole revocation fine. Finding the latter point only to have merit, we order the judgment modified to delete reference to the parole revocation fine and otherwise affirm the judgment.

FACTUAL BACKGROUND

A. *Coming to America*

John Simpson, a roller coaster enthusiast visiting from England, arrived with two friends at the Los Angeles airport on Saturday, February 13, 1999, where they were met by a fourth friend who lived in the Los Angeles area. At the Los Angeles airport Simpson rented a white Chevrolet Cavalier, which he was scheduled to return to the San Diego airport one week later, on Saturday, February 20. Simpson arranged to meet his friends back in Los Angeles on the morning of Friday, February 19.

On Saturday night Simpson stayed in Castaic, on Sunday in Anaheim, and Monday and Tuesday Simpson stayed in San Diego motels. On Wednesday, February 17, 1999, about 3:40 p.m., Simpson checked into the Rodeway Inn on Spring Street in La Mesa, where he had stayed on other occasions, and where he was scheduled to remain until Saturday. Sometime after 6:00 p.m. on the evening he came to the La Mesa motel, Simpson was seen by the motel manager standing near his car in the parking lot in the company of another, taller man. About 7:00 p.m. Simpson called his friend in Los

Angeles, sounding "upbeat." On Thursday morning a maid arrived to clean Simpson's room, saw a partially covered man in bed, and left without cleaning the room or approaching the man in the bed. She did the same thing on Friday morning, February 19, when she again saw a man in bed when she opened the door.

### B. *The Discovery of Simpson's Murder*

On Friday morning, Simpson's friends waited for him in Los Angeles, as they had planned to go with him to Knott's Berry Farm that morning. About a half-hour after the appointed time, one of his English friends called Simpson's room at the Rodeway Inn, but there was no answer. She called Simpson's room several more times, but when he did not answer, the two friends from England went to Knott's Berry Farm to look for Simpson, and asked their Los Angeles friend to contact San Diego police.

About 2:20 p.m. that afternoon, a La Mesa police officer arrived at the Rodeway Inn to check on Simpson's welfare. The officer obtained a pass key, went to Simpson's room, knocked on the door and announced his presence, but received no response. When the officer then entered the room and turned on the light, he saw a suitcase on the floor with its contents scattered around, and a man lying on the bed with the lower half of his body covered with a sheet and a pillow case tied around his neck. The man appeared to be dead, and the officer called in a possible homicide.

Evidence technicians found Simpson's room in disarray. A toiletry bag was under a pile of clothing, and bottles of cologne, shampoo and lotions were in a heap next to the clothing. Three latent prints were recovered from the bathroom sink area, and one more latent print was recovered from the refrigerator. An autopsy determined Simpson had died from asphyxia caused by ligature strangulation (the pillow case tied around his neck), a process requiring at least five minutes of sustained pressure to cause death, although the victim would lose consciousness in about 30 seconds.

### C. *The Arrest of Barker*

On Sunday, February 21, 1999, a sheriff's deputy on patrol in Lemon Grove saw a white sedan parked with the driver's window down. The deputy called in a check on the license plate and approached the car, in which Barker appeared to be asleep. The deputy roused Barker and asked him what he was doing, but before Barker could answer, the sheriff's dispatcher called for backup units to assist the deputy, as the license number of the car, Simpson's rental, had been entered in the system as a stolen vehicle involved in a homicide. Barker was arrested without incident.

The keys to Simpson's car were in the ignition. A pair of Simpson's tennis shoes were on the rear floor of the rental car, and a fanny pack which had belonged to Simpson, containing his credit cards and identification, was found under the driver's seat in which Barker had been asleep. Barker's left thumb print was on one of Simpson's credit cards. Barker's left palm print was one of the latent prints found in the bathroom sink area of Simpson's motel room.

### D. *Attempted ATM Use, Admissions, and Other Matters*

On the evening of Wednesday, February 17, Barker, driving a late-model white sedan, visited a friend of his in El Cajon, Carol Atherton. Barker told Atherton he was having financial problems, and a friend of his had loaned him three credit cards and given him the PIN's (personal identification numbers), but he had mixed them up. Atherton told Barker she would help him out, and between 11:45 and midnight that evening, Atherton made three attempts to withdraw cash at two different ATM's (automated teller machines), but was unsuccessful.

The next morning Barker returned to Atherton's house, drove her daughter to school and gave the daughter $20 for lunch money. He then drove back to Atherton's house. Before leaving, Barker gave Atherton a pair of (Simpson's) ankle boots, saying they were too small for him and might fit her daughter. That evening Barker drove Atherton to visit a friend in Lemon Grove, and then they simply drove around.

While they drove around, Barker told Atherton the car they were in belonged to a man he had killed in a motel room on Spring Street. Barker described strangling the man with a pillowcase, saying he had never seen a man's face turn that black before.[2] Barker told Atherton he had remained in the room some hours, and had worn gloves except when picking up some cologne bottles he had meant to bring with him in a bag, but which he had forgotten. Barker also told Atherton he had heard his victim talking on the telephone about being somewhere on Friday, and the car was "good" until then, because Barker had left his victim in the bed, partially covered. Before taking Atherton home, Barker said something like, "I guess you've never been around a murderer before."

A friend of Atherton's daughter saw Barker at the Athertons with a late-model white car. The boy asked Barker whose car it was, and Barker did not

---

[2] When a person is being strangled, the cutoff of blood flow to the head results in the person's face changing colors. A strangulation victim's face would first appear to turn red, then purple and darker purple as the pressure is maintained, and might finally appear to have a blackish color.

answer. The boy asked if the car was "hot," and Barker told him the car's owner was dead in a motel room. The boy exclaimed, "What?" Barker repeated that the owner of the car was dead in a motel room.

The boy asked Barker why he was driving the car, and Barker replied that the car and the motel room had been paid up for two more days. The boy later told his father what Barker had said. When interviewed by police, the boy initially denied knowing anything, but when asked if he would take a polygraph examination, which he refused, the boy disclosed what Barker had said to him.

### E. *Defense*

Barker presented no evidence in his defense. In closing argument, however, in response to the prosecutor's argument that this was not a "what was it" but only a "who did it" type of case (that is, the prosecutor argued that Simpson had clearly been murdered in the course of a robbery, and the only question before the jury was the identity of the robber/murderer), Barker's counsel argued that the credibility of the witnesses who had recounted Barker's admissions was in question, as was the validity of the palm print found in Simpson's room and its attribution to Barker, and that the only crime shown by the evidence was Barker's possession of a stolen car.

### PROCEDURAL BACKGROUND

By amended information filed October 25, 1999, the District Attorney of San Diego County accused Barker in the first count of murder (Pen. Code,[3] § 187, subd. (a)), and in a second count of robbery (§ 211). It was further alleged the murder was committed during the course of the robbery (§ 190.2, subd. (a)(17)), that Barker had used a deadly weapon (§ 12022, subd. (b)(1)), and that Barker had served a prior prison term for burglary (§ 667.5, subd. (b)), which also constituted a prior serious felony conviction (§ 667, subd. (a)(1)) and a "strike" prior (§ 667, subds. (b)-(i)).

Trial of the prior conviction allegations was bifurcated at Barker's request. Jury trial of the other charges began on October 25, 1999, and on October 29, 1999, the jury found Barker guilty of the charges, found the murder was of the first degree, and also found true the felony-murder special circumstance and the weapon use. Barker then admitted the truth of the prior conviction allegations.

On November 30, 1999, Barker was sentenced to a term of life in prison without possibility of parole, plus six years. Timely notice of appeal was filed.

---

[3]All statutory references are to the Penal Code unless otherwise specified.

DISCUSSION

I

*Jury Instructions*

Barker claims the trial court prejudicially erred in both giving and in failing to give certain jury instructions. ■ The general rule is that in a criminal case the trial court must instruct on the "principles of law relevant to the issues raised by the evidence [citations] and has the correlative duty 'to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues.' [Citation.]" (*People v. Saddler* (1979) 24 Cal.3d 671, 681 [156 Cal.Rptr. 871, 597 P.2d 130].) With this preliminary rule in mind, we address Baker's instructional error contentions in turn.

A. *CALJIC No. 2.15*

During jury instruction discussions, the People requested the trial court to modify the originally submitted 1996 version of CALJIC No. 2.15 to add numbers and separate paragraphs for certain corroborating facts the jury could consider. Defense counsel had no objection to the suggested revision to clarify the language of the pattern instruction. The court thereafter instructed the jury under CALJIC No. 2.15 as modified, as follows: "If you find that the defendant was in conscious possession of recently stolen property, the fact of that possession is not by itself sufficient to permit an inference that the defendant is guilty of the crimes of *murder* or robbery.[4] Before guilt may be inferred, there must be corroborating evidence tending to prove the defendant's guilt. However, this corroborating evidence need only be slight, and need not by itself be sufficient to warrant an inference of guilt.

"[A]s corroboration, you may consider . . . :

"(1) The attributes of possession, that is, as to time, place and the manner;

"(2) That the defendant had an opportunity to commit the crime charged;

"(3) The defendant's conduct;

"(4) His false or contradictory statements, if any, and any other statements that he may have made with reference to that property;

---

[4] The written instructions included the crimes of murder and robbery in the conjunctive.

"(5) A false account of how he acquired possession of the stolen property and;

"(6) Any other evidence which tends to connect the defendant with the crime charged."

██ On appeal, Barker contends the trial court committed reversible error in instructing the jury with a version of CALJIC No. 2.15 that was modified to include murder as a crime to which it would apply.[5] ██ Barker acknowledges CALJIC No. 2.15 has withstood numerous challenges (see *Barnes v. United States* (1973) 412 U.S. 837, 843-846 [93 S.Ct. 2357, 2362-2363, 37 L.Ed.2d 380] (*Barnes*); *People v. Holt* (1997) 15 Cal.4th 619, 676-677 [63 Cal.Rptr.2d 782, 937 P.2d 213] (*Holt*); *People v. Mendoza* (2000) 24 Cal.4th 130, 176-177 [99 Cal.Rptr.2d 485, 6 P.3d 150] (*Mendoza*)), and is based upon a long-standing rule of law which allows a jury to infer guilt of a theft-related crime from the fact a defendant is in possession of recently stolen property when coupled with slight corroboration by other inculpatory circumstances which tend to show guilt (see *People v. McFarland* (1962) 58 Cal.2d 748, 754-758 [26 Cal.Rptr. 473, 376 P.2d 449] (*McFarland*); *People v. Anderson* (1989) 210 Cal.App.3d 414, 420-432 [258 Cal.Rptr. 482] (*Anderson*). ██ Barker argues, however, there is no established legal principle that a guilty verdict on a murder charge may be based upon a finding of possession of stolen property combined with "slight" corroborative evidence. He thus asserts the giving of the instruction with respect to his murder charge was an improper evidentiary pinpoint instruction which encouraged jurors to draw inferences favorable to the prosecution and misled them as to the prosecution's burden of proof.

██ Although Barker did not object to the giving of the instruction below, because his "claim . . . is [essentially] that the instruction is *not* 'correct in law' and that it violated his right to due process of law[,] the claim . . . is not of the type that must be preserved by objection. [Citations.]" (*People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7 [86 Cal.Rptr.2d 243, 978 P.2d 1171] (*Smithey*), italics in original.) ██ Having considered the merits of Barker's arguments, we agree the court's reading of CALJIC No. 2.15 with the reference to the murder charge was error, but find such harmless on this record.

In *Barnes*, the United States Supreme Court noted that "[f]or centuries courts have instructed juries that an inference of guilty knowledge may be

---

[5]Barker raises no issues on appeal concerning the modification requested at trial by the prosecutor concerning the renumbering of the second paragraph of CALJIC No. 2.15. Nor does he raise any contention regarding the version of the instruction given. Any differences between such version and earlier or later revisions of the instruction is not pertinent to the issue Barker now raises.

drawn from the fact of unexplained possession of stolen goods." (*Barnes, supra*, 412 U.S. at p. 843 [93 S.Ct. at p. 2362].) The court in *Barnes* found that such inference comported with due process if "the evidence necessary to invoke the inference is sufficient for a rational juror to find the inferred fact beyond a reasonable doubt . . . ." (*Ibid.*)

In California, CALJIC No. 2.15 has evolved from cases holding that proof of possession of recently stolen property is insufficient by itself to support a guilty verdict as to a theft-related offense. (See *McFarland, supra*, 58 Cal.2d at pp. 754-758; *People v. Clark* (1953) 122 Cal.App.2d 342, 345 [265 P.2d 43].) It is a permissive, cautionary instruction which inures to a criminal defendant's benefit by warning the jury not to infer guilt merely from a defendant's conscious possession of recently stolen goods, without at least some corroborating evidence tending to show the defendant's guilt. (See *People v. Johnson* (1993) 6 Cal.4th 1, 35-37 [23 Cal.Rptr.2d 593, 859 P.2d 673] (*Johnson*); *People v. Gamble* (1994) 22 Cal.App.4th 446, 452-455 [27 Cal.Rptr.2d 451] (*Gamble*).) Such an inference of guilt has been held not to relieve the prosecution of its burden of establishing guilt beyond a reasonable doubt. (*McFarland, supra*, 58 Cal.2d at pp. 756-757; *Gamble, supra*, 22 Cal.App.4th at pp. 453-454; *Anderson, supra*, 210 Cal.App.3d. at pp. 430-432.) The prosecutor's use of this permissive inference comports with due process unless there is no rational way for the jury to make the logical connection which the presumption permits. (*Ulster County Court v. Allen* (1979) 442 U.S. 140, 157 [99 S.Ct. 2213, 2224-2225, 60 L.Ed.2d 777]; see also *Gamble, supra*, 22 Cal.App.4th at pp. 454-455.)

As the court in *Gamble* found, "the language of CALJIC No. 2.15 contemplates its use for far more than knowingly receiving stolen property charges, for in the body of the instruction is a blank for insertion of the named charge" to which it applies. (*Gamble, supra*, 22 Cal.App.4th at p. 453.) Such deduction is supported by the Use Note to CALJIC No. 2.15 (6th ed. 1996) page 57, which provides that such instruction "will serve to cover the effect of possession of recently stolen property in [the offenses of] robbery, burglary, theft and receiving stolen property," and by the court's observation in *McFarland* that the inference "is applicable whether the crime charged is theft, burglary, or knowingly receiving stolen property. [Citation.]" (*McFarland, supra*, 58 Cal.2d at p. 755.)

Further, "it is not just the inference as to defendant's knowledge that the property was stolen that may be drawn, but in the context of theft crimes other than receiving stolen property, CALJIC No. 2.15 by its very language permits the jury in a proper case to infer the identity of defendant as the one who committed the crime." (*Gamble, supra*, 22 Cal.App.4th at p. 453.)

CALJIC No. 2.15 has also been held appropriate in cases where the inference to be drawn in theft-related crimes concerned the defendant's intent to steal (*Holt, supra*, 15 Cal.4th at pp. 676-677; *Johnson, supra*, 6 Cal.4th at pp. 35-38), or whether the property in the defendant's possession had even been stolen from the victims (*Holt, supra*, at pp. 676-677; *Johnson, supra*, at pp. 35-38).

More recently our Supreme Court has upheld the giving of CALJIC No. 2.15 in several murder cases, but only with regard to the crime of burglary in *Johnson, supra*, 6 Cal.4th at pages 36-38, of robbery and burglary in *Smithey, supra*, 20 Cal.4th at pages 975-979, and with regard to robbery, burglary and kidnapping to commit robbery in *Mendoza, supra*, 24 Cal.4th at pages 176-177. In *Johnson*, a felony-murder theory was based upon a killing during the course of a burglary. *Smithey* involved a murder committed during the course of robbery and burglary. *Mendoza* involved arson, rape, robbery, the murder of one victim, and the kidnapping of others for the purposes of committing robberies. In none of the cases did the trial court give CALJIC No. 2.15 with regard to the murder charges. Although the court in *Mendoza* mentioned the instruction with regard to the crime of kidnapping to commit robbery, no issue was raised or addressed in that case as to whether such was an extension of the use of CALJIC No. 2.15.

Our research has disclosed no reported decision which has involved the giving of CALJIC No. 2.15 solely with respect to a nontheft crime or with the offense of murder. Nor have the parties cited such a case. Although *Mendoza, supra*, 24 Cal.4th 130, as noted above, appears to have extended the use of CALJIC No. 2.15 beyond the traditional theft-related offenses, kidnapping for the purposes of robbery is arguably by definition a theft-related offense, and *Mendoza* is not authority for an extension of CALJIC No. 2.15 to a murder charge because it did not consider that proposition (see, e.g., *People v. Saunders* (1993) 5 Cal.4th 580, 592, fn. 8 [20 Cal.Rptr.2d 638, 853 P.2d 1093]). We are thus faced with the issue of whether CALJIC No. 2.15 was properly used in this case with regard to Barker's charge of murder, i.e., whether the inference of the identity of Barker as the murderer was one rationally to be drawn from the conscious possession of Simpson's car, credit cards, and other property, coupled with slight corroboration.

Viewed in the abstract, it might be possible, even though unlikely, for a juror to read CALJIC No. 2.15, when given with reference to murder, to permit an inference of guilt of that crime merely from the possession of recently stolen property and "slight" corroborating evidence. So read, such instruction would, as Barker argues, unnecessarily inject possible confusion into an already complex area of law. Although CALJIC No. 2.15 has been held to be a permissive, cautionary instruction that inures to a criminal

defendant's benefit when given with a theft-related offense (see *Johnson, supra*, 6 Cal.4th at p. 37), given with regard to murder, the court is essentially singling out the fact of possession of recently stolen property as one that, if the jury finds it, will support a murder conviction with merely slight corroborating evidence. Because we do not believe the same natural and logical inferences for the crime of murder flow from the possession of stolen property coupled with slight corroborating evidence as for theft-related offenses like receiving stolen property, robbery and burglary, we cannot approve such an extension of this theft-related principle to the general crime of murder. Proof a defendant was in conscious possession of recently stolen property simply does not lead naturally and logically to the conclusion the defendant committed a murder to obtain the property.[6] Hence we find that the trial court's inclusion of such non-theft offense in CALJIC No. 2.15 in this case was error.

The question then becomes whether there was prejudicial error, i.e., whether, given all the instructions and other relevant circumstances, there is a reasonable likelihood that the jury misinterpreted the law in a way potentially unfavorable to the defense. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72, 73, fn. 4 [112 S.Ct. 475, 482, 116 L.Ed.2d 385]; *People v. Kelly* (1992) 1 Cal.4th 495, 526-527 [3 Cal.Rptr.2d 677, 822 P.2d 385].) On the facts of this case, we find no prejudicial error.

As noted earlier, CALJIC No. 2.15 has generally been held to be favorable to a defendant by telling the jury possession of stolen property alone is insufficient to permit an inference that defendant is guilty of the charged crime. (*Johnson, supra*, 6 Cal.4th at p. 37.) The second paragraph of the instruction tells the jury it "may consider" the categories of additional corroborating evidence listed, but does not require the jury to take them into account. (*Mendoza, supra*, 24 Cal.4th at p. 177.) Further, the trial court not only instructed the jury on the required elements of murder, but also on robbery, first degree felony murder based upon a murder committed during the commission of a robbery, and on the special circumstance of murder in the commission of a robbery. With regard to such offenses and circumstance, the jurors were expressly told the elements of each must be proved beyond a reasonable doubt.

---

[6]From the history and development of CALJIC No. 2.15, we glean that the instruction has been used in theft-related cases because there is a substantial connection between the established fact of conscious possession of recently stolen property and the inferred fact, i.e., knowledge that the property in the defendant's possession was stolen (*McFarland, supra*, 58 Cal.2d at pp. 754-758). With the inference from the knowledge and conscious possession of such property, and slight additional evidence as corroboration, the intent to steal, identity, and the determination a defendant committed the acts necessary to constitute robbery and burglary have been found to naturally and logically flow and thus support the giving of CALJIC No. 2.15. (See *Smithey, supra*, 20 Cal.4th at pp. 975-979; *Holt, supra*, 15 Cal.4th at pp. 676-677.)

The jury was additionally informed of its responsibility to evaluate the totality of the evidence, including circumstantial evidence from which inferences may reasonably be drawn and how to weigh such circumstantial evidence (CALJIC Nos. 1.01, 2.00, 2.01), as well as the sufficiency of circumstantial evidence to prove specific intent or mental state (CALJIC No. 2.02). Other instructions cautioned the jury to "disregard any instruction which applies to facts determined by you not to exist." (CALJIC No. 17.31.)

Even though we believe the use of CALJIC No. 2.15 with the crime of murder could cause some juror confusion because of the multiple deductions needed to rationally make the permissive inference, considering the instructions in their entirety in this case, as we must (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248 [74 Cal.Rptr.2d 212, 954 P.2d 475]), we can find no possibility such instruction suggested that the jury need not find all the statutory elements of murder had been proven beyond a reasonable doubt. (See *Smithey, supra*, 20 Cal.4th at pp. 977-979; *Holt, supra*, 15 Cal.4th at pp. 676-677.)

Moreover, in light of Barker's multiple admissions of his guilt to Simpson's murder, and the more than abundant evidence the murder was committed in the course of a robbery, it is not reasonably probable a result more favorable to Barker would have been reached in the absence of the instructional error we have found. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Thus, while we believe future use of CALJIC No. 2.15 should be restricted to theft and theft-related crimes, no prejudicial error is shown by its reference to murder in this case.

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II

*Parole Revocation Fine*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is modified to delete reference to a parole revocation fine. In all other respects, the judgment is affirmed. The trial court is directed to

*See footnote 1, *ante*, page 1166.

amend the abstract of judgment to reflect the modification and to forward the amended abstract to the Department of Corrections.

Nares, J., and O'Rourke, J., concurred.

Respondent's petition for review by the Supreme Court was denied November 20, 2001. Kennard, J., was of the opinion that the petition should be granted.