Filed 7/26/13  P. v. Tucker CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E054399 |
| v. | (Super.Ct.No. FVA1001189) |
| RICCO TUCKER et al., | O P I N I O N |
|     Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Ingrid Adamson Uhler, Judge.  Affirmed.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant Ricco Tucker.

Steven A. Torres, under appointment by the Court of Appeal; Law Office of Philip Deitch and Philip Deitch, for Defendant and Appellant Brandon Keith Baskett.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Melissa Mandel and Warren Williams, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

Defendants Brandon Keith Baskett and Ricco Tucker were tried before separate juries and found guilty of the first degree murder of Lamont Trible. (Pen. Code, § 187, subd. (a).)[1] Defendants claim their murder convictions must be reversed because the court gave an erroneously modified version of CALCRIM No. 376 (Possession of Recently Stolen Property as Evidence of a Crime), telling the juries they could find defendants guilty of murder—a nontheft-related crime—based in part on evidence defendants knowingly possessed recently stolen property. The People concede the instructional error but argue it was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836.) We agree the error was harmless under *Watson*. Defendants also claim that insufficient evidence supports the sentencing orders requiring them to pay $4,500 in victim restitution. (§ 1202.4, subd. (f).) We conclude substantial evidence supports the restitution order. We therefore affirm the judgments in their entirety.

## II. FACTUAL AND PROCEDURAL BACKGROUND

A. *Prosecution Evidence*

Trible was known as the "gold man" because he paid cash for gold. On July 27, 2010, defendants lured Trible into a garage in Rialto and demanded his cash at gunpoint.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

Trible ran out of the garage, and either Baskett or Tucker fatally shot him. Defendants were charged with the first degree murder of Trible along with codefendants Aamon Smith and Ronnie Bluitt. Smith and Bluitt pled guilty to second degree murder and robbery and agreed to testify against defendants.[2]

1. The Robbery/Murder

On the evening of July 26, 2010, defendants met with Smith, Bluitt, and someone named "Little Trouble" or "Lil D." Smith and Bluitt had previously dealt with Trible; they knew he bought gold and carried a lot of cash. The five men "set up a plan to rob" Trible. The plan was to meet the next morning, lure Trible to Rialto under the pretense of selling him gold, and rob him.

On the morning of July 27, defendants and Little Trouble picked up Smith and Bluitt in a blue Dodge Avenger. Then, around 10:00 a.m., Smith called Trible, told him he had a lot of gold to sell, and asked him to meet him at a garage in front of an apartment on Jackson Street in Rialto. The plan was for Smith and Bluitt to meet Trible while defendants waited in the Dodge, hidden from view. When Smith or Bluitt walked out of the garage to "get more gold," that would signal defendants to come into the garage and rob Trible.

Later that day, Smith and Bluitt met Trible in front of the appointed garage. Trible's friend Guadalupe Garza was with Trible, and Trible had $8,000 to $10,000 with

---

[2] Smith's and Bluitt's plea agreements provided that if they testified truthfully, then their second degree murder convictions would be reduced to voluntary manslaughter and their 15-year-to-life sentences would be reduced to 12-year sentences.

him.  Smith and Bluitt led Trible and Garza into the garage, and Smith handed Trible a Rolex chain.  Smith told Bluitt to get more gold and Bluitt left.

Moments later, defendants walked into the garage with guns drawn.  According to Smith, Baskett put a silver and black .40-caliber gun to the back of Garza's head and told Garza and Trible to get down.  Tucker then pointed a black and brown nine-millimeter gun at Garza, while Baskett turned his gun away from Garza and pointed it at Trible's head.[3]  Trible reached for Baskett's gun.  Tucker then pointed his gun at Trible and said, "This is for real."  Trible picked up his bag and ran out of the garage.  Next, Smith ran out of the garage.  Smith heard two shots, turned, and saw Trible lying on the ground.  Smith ran back toward the Dodge Avenger and saw defendants in the car, speeding away.  Smith and Bluitt walked to Bluitt's house.  Later that day, Smith spoke with Baskett by phone and asked him whether he would give some of the robbery proceeds to Smith and Bluitt.  Baskett said, "Yeah, later on."

Garza came out of the garage after hearing shots and "all the footsteps running." Trible was lying on the ground and had two gunshot wounds.  Garza called for an ambulance and the police.

---

[3]  Bluitt did not see defendants walk into the garage, but earlier that morning he saw Baskett carrying a .40-caliber black and silver gun and Tucker carrying a nine-millimeter gun.

2. The Investigation

The police arrived at the scene of the shooting at 1:27 p.m. on July 27, 2010. Three .40-caliber shell casings were found on the garage floor. Trible suffered two gunshot wounds, and one was fatal.

A day or two after the shooting, officers stopped Baskett driving the blue Dodge Avenger and discovered that Cindy Carter had rented the car on July 23, 2010, four days before the shooting. Tucker was apprehended in Carter's home. In the trunk of Carter's Chevrolet Suburban, officers found a receipt from Shiekh Shoe Store in Victorville dated July 27, 2010, at 2:17 p.m. Surveillance videotapes showed Baskett and Tucker in the store, displaying large amounts of cash around the time the receipt was issued.

On July 28, the day after the shooting, a witness saw Baskett and Tucker wearing new clothing, in contrast to the "raggedy" clothing they had been wearing. Baskett was also carrying a black handgun in his waistband and flashing "a large amount of hundred dollar bills."

During a police interview, Tucker admitted his role in the robbery and that he and Baskett bought shoes in Victorville after the robbery, but Tucker denied shooting Trible. Baskett gave Tucker $600 of the robbery proceeds.

B. *Defense Evidence*

The defense called Detective Robert Williams, who interviewed Smith and Bluitt individually and separately. The detective conceded that when he interviewed Smith individually, Smith mentioned Tucker but did not mention Baskett. This contradicted

5

Detective Williams's testimony for the prosecution that Smith mentioned both Tucker and Baskett in his individual interview.

C. *The Verdicts, Findings, and Sentences*

The juries found defendants guilty of the first degree murder of Trible. Instructions were given solely on first degree felony murder with second degree robbery as the underlying felony. No instructions were given on any other theory of murder. Second degree robbery charges were dismissed before trial at the request of the prosecution.

The juries also found that defendants personally used firearms in the commission of the murder. (§ 12022.53, subd. (b).) Tucker was additionally convicted of assaulting Garza with a firearm, and both defendants were convicted of possessing firearms as felons. Baskett admitted one prison prior. (§ 667.5, subd. (b).)

During jury deliberations and at the request of the prosecution, the court dismissed a section 12022.53, subdivision (d) allegation against Baskett (for personally discharging a firearm causing great bodily injury or death in the commission of the murder), after the jurors indicated they were unable to agree whether Baskett was the shooter and direct perpetrator of the felony murder, or aided and abetted Tucker in the commission of the murder.

Baskett was sentenced to 11 years, plus 25 years to life; Tucker was sentenced to 10 years, plus 25 years to life; and each defendant was ordered to pay Garza $4,500 in victim restitution, among other fines.

III.  DISCUSSION

A. *The Giving of CALCRIM No. 376 on the Murder Charges Was Harmless Error*

Defendants claim their first degree murder convictions must be reversed because the court gave an erroneously modified version of CALCRIM No. 376 (Possession of Recently Stolen Property as Evidence of a Crime), applying the instruction to the crime of "murder" when by law it is limited to theft or theft-related crimes.[4]  The People concede the error but argue it was harmless.  We agree with the People.

1.  CALCRIM No. 376 Should Not be Given on Nontheft-related Offenses

As the parties agree, CALCRIM No. 376 should be given only for theft and theft-related crimes, and not murder.  (Bench Notes to CALCRIM No. 376 (2012), p. 161 ["Use of this instruction should be limited to theft and theft-related crimes," citing *People v. Barker* (2001) 91 Cal.App.4th 1166, 1176 (*Barker*) (disapproving use of former CALJIC No. 2.15, the predecessor to CALCRIM No. 376, to infer guilt of murder)]; *People v. Prieto* (2003) 30 Cal.4th 226, 248-249 [finding *Barker* "persuasive" and

---

[4] As given to each jury, CALCRIM No. 376 stated:  "If you conclude that the defendant knew he possessed property and you conclude that the property had in fact been recently stolen, you may not convict the defendant of *murder* based on those facts alone.  However, if you also find that supporting evidence tends to prove his guilt, then you may conclude that the evidence is sufficient to prove he committed *murder*.  [¶]  The supporting evidence need only be slight and need not be enough by itself to prove guilt. You may consider how, where, and when the defendant possessed the property, along with any other relevant circumstances tending to prove his guilt of *murder*.  [¶] Remember that you may not convict the defendant of any crime unless you are convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt."  (Italics added.)  The unmodified pattern instruction includes a line for inserting the crime or crimes where "murder" was inserted in the version given here.  (CALCRIM No. 376 (2012).)

7

holding the application of former CALJIC No. 2.15 "to nontheft offenses like rape or murder was erroneous"].)  The instruction "is based upon a long-standing rule of law which allows a jury to infer guilt of a theft-related crime from the fact a defendant is in possession of recently stolen property when coupled with slight corroboration by other inculpatory circumstances which tend to show guilt [of the theft-related crime]. [Citations.]"  (*Barker, supra,* at p. 1173; *People v. Harden* (2003) 110 Cal.App.4th 848, 856-857 [approving use of former CALJIC No. 2.15 for special circumstance allegation that murder was committed during a robbery or burglary].)

The instruction has been used in theft-related cases because "there is a substantial connection between the established fact of conscious possession of recently stolen property and the inferred fact, i.e., knowledge that the property in the defendant's possession was stolen [citation].  With the inference from the knowledge and conscious possession of stolen property, and slight additional evidence as corroboration, the intent to steal, identity, and the determination a defendant committed the acts necessary to constitute robbery and burglary have been found to naturally and logically flow . . . ." (*Barker, supra,* 91 Cal.App.4th at p. 1176, fn. 6; *People v. Prieto, supra,* 30 Cal.4th at p. 249 [noting the same inferences do not "logically flow" for nontheft-related offenses like rape or murder].)  But when applied to murder, as it was here, the instruction "could cause some juror confusion because of the multiple deductions needed to rationally make the permissive inference [that the defendant was guilty of murder based on his possession of recently stolen property and slight corroborating evidence.]"  (*Barker, supra,* at p.

8

1177.)  Still, the instruction neither lowers nor alters the prosecution's burden of proving every element of the charged crimes beyond a reasonable doubt.  (*People v. Gamache* (2010) 48 Cal.4th 347, 376; *People v. Prieto, supra,* at p. 248.)

## 2.  Harmless Error

It is "well established" that the *Watson* standard of harmless error analysis applies when CALCRIM No. 376 is erroneously given on a nontheft-related charge.  (*People v. Gamache, supra,* 48 Cal.4th at p. 376.)  The question is whether there is a reasonable likelihood the defendant would have realized a more favorable result had the instruction not been given.  (*Ibid.*; *People v. Parson* (2008) 44 Cal.4th 332, 357; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 101; *People v. Prieto, supra,* 30 Cal.4th at p. 249.)  Here, there is no reasonable likelihood either defendant would have realized a more favorable result had CALCRIM No. 376 not been given.

First, and as indicated, CALCRIM No. 376 did not lessen the prosecution's burden of proving each element of the murder charges beyond a reasonable doubt.  (*People v. Gamache, supra,* 48 Cal.4th at p. 376.)  To the contrary, in its last sentence, the instruction reminded the juries they could not convict defendants "of any crime" unless they were "convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt."  This important admonition necessarily focused the juries on the elements of the first degree felony murder charge, and the juries' duty to determine whether the prosecution proved each element of the charge beyond a reasonable doubt.

9

As also noted, each jury was instructed solely on first degree felony murder based on second degree robbery and not on any other murder theory, including first degree express malice murder or second degree murder. Aiding and abetting instructions were given in connection with the robbery instructions, though defendants were not charged with robbery as a substantive crime. The juries were also instructed to consider the instructions together. (CALCRIM No. 200.) Thus, in order to find defendants guilty of "murder," as the term was used in CALCRIM No. 376,[5] the juries had to find defendants either directly perpetrated the murder by shooting Trible in the course of the robbery, or aided and abetted the other defendant in robbing Trible and Trible was murdered during the course of the robbery. And ample evidence showed that defendants murdered Trible during the course of robbing him—apart from and in addition to the evidence defendants knowingly possessed recently stolen property shortly after the robbery, namely, the large amounts of cash they were displaying in the Victorville shoe store. That evidence consisted of the following:

Smith and Bluitt, defendants' accomplices, testified that they and defendants planned the robbery the night before the robbery and shooting. The plan was for Smith and Bluitt to lure Trible to the garage under the pretense of selling him gold for cash and rob him after one of them walked out of the garage, signaling defendants to walk into the garage and carry out the robbery. After Bluitt left the garage and defendants walked in with guns drawn—Baskett with a .40-caliber handgun and Tucker with a nine-millimeter

_____

[5] See footnote 4, *ante*.

10

handgun—defendants pointed their guns at Trible and Trible's friend Garza, and ordered them to get down. Trible tried to grab Baskett's gun, then grabbed his bag, ran out of the garage, and was shot.

Smith's and Bluitt's accomplice testimony identifying defendants as the robbers, and at least one of them as the shooter, was amply supported by corroborating evidence. (§ 1111.) Garza testified the robbery occurred just as Smith and Bluitt described: Garza was approached from behind, a gun was pointed at his head, and he was ordered to get down. Another gun was pointed at Trible, Trible "tried to wrestle with" that gun, then ran out of the garage and was shot.

In addition, the day after the shooting another witness saw defendants wearing new clothing, in contrast to the "raggedy" clothing they had been wearing, and saw Baskett carrying a .40-caliber handgun in his waistband. Smith and Bluitt also testified that Baskett was carrying a .40-caliber handgun at the time of the robbery, and three .40-caliber shell casings were recovered from the scene.

Thus, even if the prosecution had not presented the evidence that defendants were displaying large amounts of cash in the Victorville shoe store shortly after the robbery and shooting, and even if CALCRIM No. 376 had not been given, it is not reasonably likely the juries would not have found defendants guilty of first degree felony murder based on robbery as the underlying felony.

Defendants argue the inclusion of the crime of "murder" in CALCRIM No. 376 without at least one additional theft-related offense made the instructional error here more

11

egregious or confusing than the error in *Barker*, where a similar instruction was given on murder *and* robbery (*Barker, supra,* 91 Cal.App.4th at p. 1172) and more confusing than the error in *Harden*, where a similar instruction was given on murder, robbery and burglary (*People v. Harden, supra,* 110 Cal.App.4th at p. 855). Not so. The instructional errors here were no more confusing than in *Barker* and *Harden*.

As discussed, the juries were instructed solely on first degree felony murder *with robbery as the underlying felony* and not on any other theory of murder, including first degree express malice murder or second degree murder. Thus the juries could only have understood the term "murder," as used in CALCRIM No. 376, as consisting of first degree felony murder *based on robbery*. And to find defendants guilty of first degree murder based on robbery, the juries had to find defendants robbed Trible and that Trible was murdered during the course of the robbery. Given this circumstance—that the instructions on murder were limited to first degree felony murder based on a theft-related crime—the failure to include a theft-related offense in CALCRIM No. 376 was no more confusing than the instructions in *Barker* and *Harden,* where the juries were instructed to consider the evidence that the defendants possessed recently stolen property on their guilt of one or more theft-related offenses, in addition to murder.[6]

Lastly, defendants argue their first degree felony murder convictions must be reversed because the juries could have based their guilty verdicts on a *legally inadequate*

---

[6] Had the juries here been instructed on first degree express malice murder or second degree murder, we would agree the failure to include a theft-related offense in CALCRIM No. 376 might have been more confusing.

theory, namely, that defendants were guilty of murder if they knowingly possessed recently stolen property. (*People v. Green* (1980) 27 Cal.3d 1, 69 [when verdict may rest on two or more alternate legal theories, some legally valid and the others legally invalid, reversal is required unless court can determine from the record that the verdict necessarily rests on a legally valid ground]; *People v. Guiton* (1993) 4 Cal.4th 1116, 1127-1128 [distinguishing legally incorrect theories from factually unsupported ones].) This argument misreads CALCRIM No. 376. Again, the instruction did not tell the juries they could find defendants guilty of murder if they found defendants knowingly possessed recently stolen property. Instead, the instruction reminded the juries they could only convict defendants of murder if they found all the elements of that crime true beyond a reasonable doubt.

B. *Substantial Evidence Supports the $4,500 Victim Restitution Fine for Garza*

Defendants claim the orders requiring them to pay $4,500 in victim restitution for Garza (§ 1202.4, subd. (f)) are unsupported by substantial evidence and must be stricken. We disagree.

1.  Relevant Background

At the preliminary hearing, Garza estimated that $1,600 of the $8,000 to $10,000 sum that Trible had on his person at the time of the robbery and shooting belonged to Garza. At trial, Garza increased this estimate to $1,600 to $2,000. Prior to sentencing, Garza submitted an unsworn victim impact statement, claiming he lost $4,500.

13

Baskett was sentenced before Tucker and was ordered to pay $4,500 in victim restitution for Garza. At Tucker's sentencing hearing, Tucker's counsel pointed out to the court the discrepancies in Garza's estimated losses. The court acknowledged the discrepancies but ordered Tucker to pay a $4,500 restitution fine subject to modification, noting it had already ordered Baskett to pay the same fine; Garza's victim impact statement substantiated the $4,500 loss; and the court had "nothing to contradict" Garza's $4,500 claim of loss.

2. Analysis

Section 1202.4, subdivision (f), provides: "[I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims . . . based on the amount of loss claimed by the victim or victims or any other showing to the court." Restitution under the statute "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct . . . ." (§ 1202.4, subd. (f)(3).)

"'The standard of review of a restitution order is abuse of discretion. . . . '"When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court.'" [Citations.]' [Citation.] . . . 'In reviewing the sufficiency of the evidence [to support a factual finding], the "'power of the appellate court begins and ends with a determination as to whether there is

14

any substantial evidence, contradicted or uncontradicted,' to support the trial court's findings." [Citations.] . . .'" (*People v. Millard* (2009) 175 Cal.App.4th 7, 26.)

"At a victim restitution hearing, a prima facie case for restitution is made by the People based in part on a victim's testimony on, or other claim or statement of, the amount of his or her economic loss. [Citations.] 'Once the victim has [i.e., the People have] made a prima facie showing of his or her loss, the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim. [Citations.]' [Citation.]" (*People v. Millard, supra,* 175 Cal.App.4th at p. 26.)

Defendants concede that a victim's unsworn statement can constitute prima facie evidence of the victim's economic loss (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1542-1543 [Fourth Dist., Div. Two]), but they argue Garza's unsworn statement does not constitute prima facie evidence that he lost $4,500 in the robbery given his prior sworn testimony that only $1,600 to $2,000 of the money Trible was carrying belonged to him. Defendants also point out that in his unsworn statement Garza "does not expressly state the [$4,500] loss was from the robbery." They also argue that, "read in context, a reasonable inference from the statement is that, at or around the time of the offenses, Garza suffered total losses of $4,500, including losses unrelated to [defendants'] offenses."

We disagree with defendants' self-serving interpretation of Garza's victim impact statement. Garza discussed the emotional toll the crimes took on him and his family and states: "My Family lost a significant amount of our savings, $4,500 . . . ." This

15

constitutes a prima facie showing that Garza lost a total of $4,500 as a result of the offenses defendants committed in the present case, including, but not limited to, the $1,600 to $2,000 portion of the $8,000 to $10,000 in cash taken from Trible that Garza previously testified belonged to him. Neither defendant made any showing that Garza lost less than $4,500. The restitution orders must therefore be upheld.

## IV. DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>KING</u>
J.

We concur:

<u>McKINSTER</u>
Acting P. J.

<u>RICHLI</u>
J.

16