Filed 5/16/24  P. v. Wallace CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C096537 |
| Plaintiff and Respondent, | (Super. Ct. No. P16CRF0413) |
| v. | |
| MILO LLOYD WALLACE, | |
| Defendant and Appellant. | |

A jury found defendant Milo Lloyd Wallace guilty of two counts of first degree murder, one count of attempted murder, and one count of assault with a semiautomatic firearm.  The jury found true various firearm and great bodily injury enhancements, as well as special circumstances allegations of lying in wait and multiple murders.  The trial court sentenced defendant to two terms of life without the possibility of parole, plus 50 years to life, plus 17 years.

Defendant appeals, arguing the trial court erred in refusing to instruct the jury on voluntary intoxication for the two murder charges.  Defendant also argues the trial court

1

erred in sustaining the prosecutor's objection to defense counsel's comments regarding the absence of logical witnesses in closing argument. Finding no reversible error, we will affirm.

## I. BACKGROUND

Defendant's parents, Sandra and Leonard, lived in Placerville. Defendant's brother, Matthew, lived approximately 30 minutes away with his partner and the mother of his children, Brook. Defendant lived with Sandra and Leonard.

Leonard died in 2015. Following Leonard's death, Sandra resolved to leave the family home entirely to Matthew. Matthew's name was added to the title of the property. According to one view of the evidence, this plan did not sit well with defendant.

### A.     *Murders at the Family Home*

Sandra and Matthew spoke by phone every day. Matthew called Sandra as usual on the evening of November 10, 2015. Defendant answered the phone. Defendant told Matthew that Sandra was sleeping. This was unusual, as defendant never answered the phone, and it was out of character for Sandra to be asleep at that hour (around 7:00 p.m.). Matthew decided to check on Sandra the next day.

Matthew left for Sandra's house the next morning. He told Brook he would be home by noon. Noon came and went, and Matthew did not return. Brook texted Matthew at 1:00 p.m., 2:00 p.m., and 3:00 p.m. Matthew did not respond. This was unusual for him. Brook called Matthew's cell phone. He still did not respond. Brook also called Sandra; she did not respond either.

Brook was concerned. She called her brother, Harley, and together they drove to Sandra's house. Harley brought along a pistol, just in case. When they arrived, they noticed the lights were off, and Matthew's truck was not parked in its usual spot.

Brook approached the house and tried the door. It was locked. She saw someone through the glass. Defendant opened the door, and Brook said, "Where is Matt?"

Defendant responded, "Right here." As he spoke, defendant raised a gun within inches of Brook's face.

Brook grabbed for the gun. A struggle ensued, and Harley joined the fray. Brook and Harley grappled with defendant for several minutes. Eventually, they managed to subdue and disarm him.

Brook called 911. She told the 911 operator defendant "pulled a gun" on her. She also told the operator that defendant was "drunk as shit."

Sheriff's deputies arrived on the scene at 5:21 p.m. They encountered an active struggle, with defendant on the ground, and Harley trying to subdue him. Deputies detained defendant and found a .22-caliber revolver in his pants pocket. As they attempted to handcuff him, they noticed that defendant stopped breathing. They rolled defendant to his side, and he started breathing again.

Deputies conducted a protective sweep of the house. They found Sandra's lifeless body in her bedroom. The room smelled of decomposing human remains, and Sandra's legs were dark blue, indicating she had been dead for some time. Deputies found Matthew's body under a comforter on an outside patio. He was also dead.

Deputies found a spent .357-caliber cartridge case near Matthew's body. They also found a piece of paper, on which was written, "Back staper [sic]." A similar sentiment was found on a cabinet door in the garage. There, deputies found the words, "Never forget, back staper [sic], you back stab for no reason, you're getting nothing. Milo."

A further search of the property yielded many more guns, including multiple handguns and numerous long guns, some of which were stacked on the sofa and leaning against the wall. An assortment of ammunition and loaded magazines was also found around the property. Deputies also found a Ruger .357 revolver and a bottle of Jack Daniels whiskey.

*B.      Charges and Jury Trial*

Defendant was arrested and charged by grand jury indictment with murdering Sandra (Pen. Code, § 187—count 1)[1], murdering Matthew (§ 187—count 2), attempting to murder Brook (§§ 664, 187—count 3), and assaulting Brook with a semiautomatic firearm (§245, subd. (b)—count 4).  For counts 1 and 2, the grand jury alleged that defendant personally used a firearm (§ 12022.5, subd. (a)(1)) and personally discharged a firearm causing death or great bodily injury (§ 12022.53, subd. (d)).  For count 2, the special circumstances of lying in wait and multiple murders were also alleged (§ 190.2, subd. (a)(3) and (15)).  And for count 3, the grand jury alleged defendant personally used and intentionally discharged a firearm (§§ 12022.5, subd. (a)(1), 12022.53, subd. (b)).  Defendant pled not guilty and denied the allegations.

Defendant was tried by jury in May 2022.  The prosecution's witnesses testified substantially as described *ante*.  Additionally, Brook testified that she spoke with Sandra a couple of days before the events at issue.  According to Brook, Sandra reported that defendant had been violent and verbally abusive and was making her feel unsafe in her own home.  When asked why she told the 911 operator that defendant was "drunk as shit," Brook explained that she based her assessment on the fact that he was breathing heavily, and his pants had fallen down, but he failed to pull them back up.  Harley similarly testified that defendant was acting as though he was intoxicated.

The prosecution also presented evidence from forensic pathologist Jason Tovar, who conducted an autopsy of Sandra.  Tovar testified that Sandra died from a gunshot wound to the head at very close range.  He observed livor mortis (color from blood settling to the lower portion of the body), marbling of the skin, and skin slippage, all of

---

[1] Undesignated statutory references are to the Penal Code.

which indicated that decomposition was well underway. He removed a bullet from Sandra's head.

The prosecution also presented evidence from forensic pathologist Kelly Kobylanski, who conducted an autopsy of Matthew. Kobylanski testified that Matthew was shot in the chin and hip; the shot to the chin was fatal. Kobylanski recovered two bullets from Matthew's body.

Criminalist Angela Stroman opined that the bullet recovered from Sandra's head was a .22-caliber bullet, which was fired from the revolver found in defendant's pants' pocket. Stroman testified that the bullets recovered from Matthew's body were .22- and .38-caliber bullets. She compared the .38-caliber bullet to a .357 revolver found in the family home. She opined that the .38-caliber bullet was likely fired from the .357 revolver; however, she could not say for sure.

Dr. Michael Mirhadi, an emergency room physician, testified for the defense. Dr. Mirhadi treated defendant on November 11, 2015, for an auricular hematoma sustained in the fight with Brook and Harley. Dr. Mirhadi observed that defendant appeared intoxicated and smelled of alcohol. He ordered blood tests, which revealed that defendant's blood alcohol level was 0.36. Dr. Mirhadi's clinical impression was that defendant was suffering from "acute alcohol intoxication." However, Dr. Mirhadi could not say when defendant ingested alcohol, whether the alcohol was absorbed, or whether defendant's blood alcohol level was rising or falling.[2]

C.     *Verdict and Sentence*

The jury found defendant guilty as charged and found true the enhancements and special circumstances allegations. The trial court sentenced defendant to consecutive terms of life without the possibility of parole on counts 1 and 2 (the murders of Sandra

---

[2] Another defense witness, a lifelong friend, testified that defendant was planning to move to Montana.

and Matthew), plus consecutive terms of 25 years to life for the firearm enhancements. The trial court imposed a consecutive seven years for count 3 (the attempted murder of Brook), plus 10 years for the firearm enhancement. The trial court imposed, but stayed, the term for count 4 (the assault of Brook), as well as the remaining enhancements.

This appeal timely followed.

## II. DISCUSSION

### A. CALCRIM No. 625

Defendant argues the trial court erred in refusing to provide a voluntary intoxication jury instruction (CALCRIM No. 625) with respect to the murders of Sandra and Matthew. We disagree.

#### 1. Additional Background

Defendant asked the trial court to instruct the jury with CALCRIM No. 625 on voluntary intoxication with respect to the murders of Sandra and Matthew. The prosecution objected. The trial court observed there was evidence defendant was intoxicated at the time of the attempted murder of Brook, but no evidence as to defendant's level of intoxication at the time of the murders of Sandra and Matthew. Accordingly, the trial court instructed the jury on voluntary intoxication as applicable to attempted murder (CALCRIM No. 3426) but refused to instruct the jury with CALCRIM No. 625.

#### 2. Standard of Review and Applicable Legal Standards

We review a claim of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.'" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) In determining whether error has been committed in giving jury instructions, we consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given. (*Ibid.*) " 'Instructions should be interpreted, if possible, so as to support the judgment

6

rather than defeat it if they are reasonably susceptible to such interpretation.' " (*Ibid.*) "The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

Generally, the trial court is required to instruct the jury on the general principles of law that are closely and openly connected with the evidence and that are necessary to the jury's understanding of the case. (*People v. Barker* (2001) 91 Cal.App.4th 1166, 1172.) It also has a duty to refrain from giving incorrect instructions or instructions on principles of law that are irrelevant and would have the effect of confusing the jury or relieving it from making findings on the relevant issues. (*Ibid.*)

"[A]n instruction on voluntary intoxication, explaining how evidence of a defendant's voluntary intoxication affects the determination whether defendant had the mental states required for the offenses charged, is a form of pinpoint instruction that the trial court is not required to give in the absence of a request. (*People v. Bolden* (2002) 29 Cal.4th 515, 559.) A trial court is required to give a requested pinpoint instruction on voluntary intoxication "only when there is substantial evidence of the defendant's intoxication and the intoxication affected the defendant's 'actual formation of specific intent.' " (*People v. Williams* (1997) 16 Cal.4th 635, 677.) " ' "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." ' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.) The trial court need not give the instruction if the evidence is " 'minimal and insubstantial.' " (*People v. Barton* (1995) 12 Cal.4th 186, 201.)

*3.      Analysis*

Defendant asked the trial court to instruct the jury with CALCRIM No. 625.[3] The trial court declined, finding the instruction was not supported by the evidence. The trial court was correct.

As the trial court observed, there was considerable evidence defendant was intoxicated at the time of the assault and attempted murder of Brook. During the encounter, Brook observed that defendant's pants were falling down, something she associated with him being intoxicated. Brook told the 911 operator that defendant was "drunk as shit," and Harley appears to have shared that view. Sheriff's deputies observed that defendant stopped breathing when they tried to detain him and found a bottle of whiskey in the house.[4] Sometime later, Dr. Mirhadi discovered that defendant's blood alcohol level was 0.36, a level consistent with "acute alcohol intoxication." All of this evidence amply supports an inference that defendant was intoxicated at the time of the assault and attempted murder of Brook. But the murders of Sandra and Matthew are another story.

That defendant may have been intoxicated around the time of the assault and attempted murder of Brook does not constitute substantial evidence he was intoxicated at

---

[3] CALCRIM No. 625 states: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill[,] [or] [the defendant acted with deliberation and premeditation[,]] [[or] the defendant was unconscious when (he/she) acted[,]] [or the defendant < *insert other specific intent required in a homicide charge or other charged offense* >.] [¶] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] You may not consider evidence of defendant's voluntary intoxication for any other purpose."

[4] The record does not reveal whether the bottle was full or empty or somewhere in between.

8

the time of the murders of Sandra and Matthew hours, or even days before. The prosecution theorized that Sandra was murdered first, based on the degree of decomposition of the body. However, neither side made any attempt to fix the exact time of Sandra's death, and there was no evidence defendant was intoxicated or likely to have been intoxicated around that time (whatever it may have been). Nor was there any evidence that defendant's intoxication, if any, affected his ability to formulate intent. No evidence required CALCRIM No. 625, at least as to Sandra.

Defendant argues Matthew presents a closer case. He emphasizes that Matthew was alive on the morning of November 11, 2015, and presumably died sometime over the course of the day. That much seems true enough. But the fact that Matthew was murdered on November 11, 2015, and defendant was intoxicated later that same day, does not establish that defendant was intoxicated at the time of the murder.

Here, it is helpful to remember the timeline. Matthew left for Sandra's house on the morning of November 11, 2015, promising to be home by noon. He did not return by noon and did not respond to text messages or phone calls from 1:00 p.m. on. Deputies arrived at Sandra's house at 5:21 p.m. Substantial evidence supports an inference that defendant was intoxicated—indeed, very intoxicated—at 5:21 p.m., as we have said. That inference, in turn, supports an inference that defendant started drinking some time earlier. But there was no evidence that would have allowed the jury to infer that defendant started drinking before he shot Matthew, let alone that he was intoxicated at the time of the shooting, or his intoxication was such that he was unable to formulate intent. Under the circumstances, the trial court properly refused the instruction.

B.     *Failure to Call Logical Witnesses*

Next, defendant argues the trial court erred in sustaining the prosecutor's objections to defense counsel's comments in closing argument concerning the prosecution's failure to call witnesses to testify about DNA or fingerprint evidence on the

9

guns and ammunition used in the shootings.  The People concede the error, and we accept the concession.  However, we also agree with the People that the error was harmless.

### 1.    *Additional Background*

Defense counsel's closing argument focused on the circumstantial nature of the evidence concerning the murders of Sandra and Matthew, noting there was "no proof as to how this happened."  Defense counsel urged the jury to consider "the little evidence that was actually collected and maintained."  He observed that Stroman, the criminalist, testified at length about the guns found in the home, but offered no evidence that any of the guns belonged to defendant, or that he fired them.

Turning to Dr. Tovar, defense counsel said:  "What about Jason Tovar?  He was a coroner.  He was the person who testified concerning Sandra Wallace.  He couldn't say the manner in which the gun was used.  He couldn't say if the gun discharged accidentally by suicide or even if it was fired by [defendant].  There's no evidence to prove how the gun caused Sandra Wallace's death.  Simply put, we do not know how the gun was fired or the circumstances.  We don't know why and we don't know how."[5]

Defense counsel continued:  "Okay, CSI.  Is there any DNA?  No.  Any fingerprints on the guns or casings?"  The prosecutor objected, and the trial court sustained the objection, instructing defense counsel to rephrase his argument.  Defense counsel then said:  "All right.  We know that there was in this case you have no evidence of DNA.  No evidence of fingerprints."  The prosecutor objected again, and the trial court sustained the objection a second time, noting that none of the witnesses were asked about "CSI," DNA, or fingerprints.

---

[5] Defense counsel did not ask Dr. Tovar whether Sandra's injuries may have been the result of suicide or accidental discharge.  He merely asked whether Dr. Tovar was able to form any opinion as to the position of the gun or Sandra's position at the time the gun was fired.  These are not the same things.

Defense counsel then continued his argument, suggesting Sandra could have committed suicide or been shot accidentally, and someone other than defendant could have shot Matthew. Defense counsel concluded: "Just like the District Attorney indicated, I don't know why these things happened, he doesn't know and there's no proof as to how these things happened. We don't know how the gun was fired. Was it self-inflicted? Accidental discharge? Was it suicide? Someone else in the home? We don't know how the gun was fired. For Matthew, we don't know who shot him. Where he was shot. How he was shot. Which shot came first."

2.     *Analysis*

The parties agree, and so do we, that the trial court erred in sustaining the prosecutor's objection to defense counsel's comment on the failure to call witnesses to testify about possible DNA and fingerprint evidence on the guns and ammunition used in the murders. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275 ["it is neither unusual nor improper to comment on the failure to call logical witnesses"]; see also *People v. Alaniz* (2017) 16 Cal.App.5th 1, 6 ["It is firmly established that in general both the defense and, in appropriate circumstances, the prosecution may make arguments to the jury based on the failure of the opposing party to present evidence"].) We therefore focus our analysis on the question of prejudice.

Defendant argues the error interfered with defense counsel's argument that Sandra shot herself, either accidentally or on purpose. That argument, he says, was buttressed by evidence that Sandra was shot at very close range. Defendant also notes that Dr. Tovar was unable to say what position Sandra might have been in when she was shot, and found alcohol and fentanyl in Sandra's system, a combination that would have had "depressive effects" on the user. From this evidence, defendant argues, a reasonable juror could have inferred that Sandra shot herself, and defendant attempted to hide her body to protect Matthew.

11

We are not convinced defense counsel's comments regarding the prosecution's failure to call logical witnesses to testify about DNA or fingerprint evidence would have made any difference here. Defendant and Sandra lived in the same house. A great many guns were found in and around the house, as well as an assortment of ammunition. Nothing suggests the presence of guns and ammunition was unusual for the family. Nor was there any evidence they were the exclusive province of one member of the household, but not the other. If anything, as defense counsel observed in oral argument, the evidence suggested, "the Wallace family believed in their Second Amendment federally protected constitutional rights."

Had defense counsel continued his argument, the jury might have inferred that another expert would have testified that Sandra's fingerprints or DNA were found on the murder weapon or the fatal bullet, but that would not have meant much, given that Sandra lived in the same house as defendant, and could have handled the weapon or bullet on any number of occasions, for any number of reasons. Under the circumstances, we conclude defense counsel's comments would have added nothing to defendant's argument that Sandra shot herself (which defense counsel made anyway) and the absence of logical witnesses would not have moved the jury either way. Thus, we conclude the error was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## III.  DISPOSITION

The judgment is affirmed.

/S/

_____

RENNER, J.

We concur:

/S/

_____

HULL, Acting P. J.

/S/

_____

FEINBERG, J.