Filed 8/4/22  P. v. Mayberry CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAMONE KIKI MAYBERRY,<br><br>    Defendant and Appellant. | D079884<br><br><br>(Super. Ct. No. F18906509) |


APPEAL from a judgment of the Superior Court of Fresno County, Jonathan B. Conklin, Judge.  Reversed in part and remanded with instructions.

Matthew A. Siroka, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Timothy L. O'Hair and Clara M. Levers, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted Damone Kiki Mayberry, among other charges, of first degree murder with a robbery-murder special circumstance and found true he personally and intentionally discharged a firearm in committing the murder. (Pen. Code,[1] §§ 187, subd. (a), 190.2, subd. (a)(17), 12022.53, subd. (d).)  In a bifurcated proceeding, the trial court found Mayberry suffered a prior strike conviction (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and a prior prison term (former § 667.5, subd. (b)).  Mayberry was sentenced to a term of life without the possibility of parole on the murder, consecutive to 25 years to life for the firearm enhancement.

On appeal, Mayberry challenges the trial court's modification of the CALCRIM No. 376 instruction, which tells the jury it can consider a defendant's possession of recently stolen property as evidence the defendant committed a crime, to refer to the nontheft offenses of murder and assault with a firearm.  We agree the court erred in modifying the instruction but conclude the error was not prejudicial.  Mayberry also brings an Eighth Amendment challenge to the felony-murder special circumstances statute (§ 190.2, subd. (a)(17)).  This challenge fails because it is foreclosed by controlling California Supreme Court decisions.  Finally, Mayberry raises three sentencing issues.  We conclude two of them—based on recent legislative amendments of sections 654 and 667.5, subdivision (b)—have merit.  In light of the two meritorious sentencing issues, we vacate his sentence, strike the one-year enhancement imposed under former section 667.5, subdivision (b), and remand for resentencing in accordance with

---

[1]     Further unspecified statutory references are to the Penal Code.

another new statute (§ 1172.75) and this opinion.  In all other respects, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*The Evidence*

A.   *Bridget M.:  The Robbery and Murder of Lorenzo "Red" M.*

In the early morning of September 18, 2018,[2] Lorenzo M. and his girlfriend Bridget M. were asleep in Lorenzo's studio apartment.  The apartment was located in a Fresno apartment complex known as "the Flats."  Lorenzo, nicknamed "Red," sold marijuana and crystal methamphetamine "for really cheap."  At around 5:00 a.m., someone knocked on the door.  Lorenzo went to answer.  Bridget heard a female voice, and then Lorenzo said, "come inside."  Lorenzo turned around and walked toward the kitchen.  A blond woman wearing a hoodie and jeans entered the apartment.  Bridget saw the woman's face; she had "jagged" and "[c]hipped" teeth.  Although Bridget did not immediately recognize the woman, she later identified her as Gypsy Hall.

Hall started to follow Lorenzo into the kitchen but then stopped.  A tall, thin African American man wearing a red bandanna over his face entered the apartment through the open door.  Bridget was still lying in bed but she could tell the man was tall because he was almost the height of the door.  He was holding a "little gun" in his right hand.  He walked into the kitchen behind Lorenzo and shot Lorenzo in the back of the head.

Bridget screamed as Lorenzo fell to the ground.  The man and Hall went to the bed and started hitting Bridget.  They yelled at Bridget to find

---

[2]     Unless otherwise noted, all dates refer to 2018.

3

the drugs and the money. Bridget was hit in the head, causing her to bleed. Hall grabbed Bridget by her hair, pulled her out of bed, and forced her to sit naked on a weight bench in the dining area near the kitchen.

The man pointed the gun at Bridget as he and Hall walked around the apartment. The two dug through kitchen cupboards and took marijuana. They gathered clothing, baseball hats—Lorenzo collected expensive clothing and baseball hats—and other items, including a camouflage bag that contained a jar of marijuana, and electronic devices, including cell phones. The man threatened Bridget, shot her in the leg, and immediately left the apartment.

Hall stayed behind for several minutes gathering property. She told Bridget "they're going to be in the front" if Bridget wanted to come with them, which Bridget found "odd." Hall took Bridget's purse that contained cell phones belonging to Bridget. Hall left the apartment, her arms spilling over with stolen items. As she left through the front door, she dropped a digital scale.

Bridget was in pain and bleeding profusely from her leg. She looked at Lorenzo. He seemed to be alive; she could hear him "grunting." Bridget ran out of the apartment and knocked on neighbors' doors looking for help. Rick B. let her inside his apartment. At 5:41 a.m., Rick called 911 and reported that a woman he did not know had been shot and she was bleeding.

B.     *Arrest of Mayberry and Hall on September 18*

Officers from the Fresno Police Department responded to Rick's apartment. An officer found Bridget inside on the couch. There was dried blood on her face from a wound on the left side of her head. She also had a gunshot wound on the inside of her right thigh. She said her boyfriend had also been shot, gave the officer her boyfriend's name and apartment number

4

but did not provide his complete street address. Bridget was taken to the hospital by emergency responders.

After a search, police officers found Lorenzo's apartment. The screen door was unlocked, and the interior door was open. They found Lorenzo laying on his back in the kitchen. He was making a gurgling noise, and there was a lot of blood. Lorenzo was taken to the hospital but died of a gunshot wound to the back of his head.

The interior of Lorenzo's apartment was in disarray. The kitchen cabinet was open. Glasses and cups were knocked over. Digital scales, a white powdery substance, and a green leafy substance were found, all indicative of potential drug sales. Outside the apartment, police officers found a pillow in a nearby planter box, a small digital scale right outside the front door of the Lorenzo's apartment, and a broken mug and empty mason jar several hundred feet from the apartment, close to the area of the parking lot and driveway leading in and out of the complex.

Detectives talked to residents of the apartment complex to develop leads on potential suspects. The lead detective explained, "In an apartment complex like this, . . . everybody knows everybody." One of the residents they spoke to was Tiffany W. Tiffany knew Hall because she was a longtime friend of Hall's mother and Hall used to live in the apartment complex but had been evicted. Early in the morning on September 18, Hall had knocked on Tiffany's door and asked to use her bathroom. Hall was wearing a hoodie cinched tightly around her face, and she seemed nervous and fidgety. Hall used Tiffany's bathroom, got a drink of water, and left.

While canvassing the apartment complex, detectives also received information from an anonymous female who provided Facebook names and profiles of the possible perpetrators. One of the Facebook profiles belonged to

5

Hall. The other Facebook profile featured a photograph of an African American man. The associated Facebook page contained information linking it to Mayberry. A photograph of Mayberry from the Department of Motor Vehicles matched the photograph of the African American man in the Facebook profile. There was also a picture of Hall on Mayberry's Facebook page.

Bridget told detectives one of her stolen cell phones had a "find my device" application linked to her Google account. Law enforcement obtained "ping" information from Google revealing the location of Bridget's stolen phone.[3] One ping placed the phone at a gas station in Kingsburg at 7:43 a.m. on September 18. The surveillance video obtained from the gas station for that timeframe showed Hall, Mayberry, and another man in a gray Hyundai Sonata. Mayberry could be seen moving a large blue bin in the trunk of the car.

A detective was assigned to surveil Hall's residence located on North Dearing Avenue (Hall's house). The residence was owned and occupied by Hall's parents. At around 1:30 p.m. on September 18, the detective saw a gray Hyundai Sonata going south on North Dearing Avenue. It came to a stop at Hall's house and then sped away.

A subsequent ping revealed that Bridget's stolen phone was in Visalia. An address was found in Visalia for an apartment associated with Mayberry's father. At around 7:00 p.m. on September 18, law enforcement responded to that address and spotted Mayberry sitting outside near the street. As officers approached and identified themselves, Mayberry turned and ran to the

---

[3]    A detective explained the term "pings" is "jargon for . . . tracking a cell phone." It refers to receiving the latitude and longitude coordinates revealing the location of a device at a particular date and time.

complex and into his father's apartment. The officers gave chase and arrested Mayberry. Hall, who was at the apartment with Mayberry, was also arrested. Officers searched the apartment and found Bridget's purse and a blue bin, which contained baseball caps, clothing, cell phones, a camouflage bag holding two jars of marijuana, and other items, including credit cards and identification cards belonging to Mayberry, Hall, and Bridget.

C. *The Gray Hyundai Sonata*

The police obtained surveillance footage from the home security system of a residence near the Flats. It showed a Hyundai Sonata arriving at the apartment complex at approximately 3:57 a.m. on September 18. The car then backed into a parking stall and sped away with its headlights off at around 5:37 a.m.

On September 19, the detective who saw the gray Hyundai Sonata outside Hall's house on September 18 responded to a tow yard to view a Hyundai Sonata that had been reported stolen and recovered. He confirmed it was the same vehicle he had seen the day of the murder. A fingerprint that matched Mayberry's known prints was found on the exterior door frame of a rear passenger door. A fingerprint that matched Hall's known prints was found on the hood of the car.

D. *Gypsy Hall*

Hall testified at trial under an agreement with the District Attorney's Office. She had pled guilty to manslaughter and two counts of robbery and was facing up to 13 years in prison.

Hall and Mayberry had been dating for six or seven months, at the time of the robbery and murder. Mayberry was around 6'3" or 6'4" tall, and he was "skinny."

7

Hall used to live at the same apartment complex as Lorenzo, which she called the Flats. She used to clean Lorenzo's apartment and sell drugs for him. She also bought drugs from Lorenzo. In September 2018, Hall was using methamphetamines every day. She and Mayberry would use methamphetamines together. Neither of them were working at the time. Hall earned money to buy drugs by prostituting herself. Mayberry was jealous of Lorenzo and at times would accuse Hall of having a sexual relationship with Lorenzo. Twice, Mayberry went with Hall to Lorenzo's apartment to buy drugs. One time, Mayberry and Lorenzo had a dispute about a drug purchase. Mayberry and Hall had bought a "ten sack" but were "short a dollar" and afterwards, Lorenzo texted Mayberry, "make sure you have the full money next time."

On the evening of September 17, Hall, Mayberry, Chucky, and J.S. (Hall's 15-year-old niece) were hanging out in Hall's bedroom at Hall's house getting high on methamphetamines. Hall and J.S. also took Xanax. There was no discussion about committing a robbery against Lorenzo, although Mayberry talked about going to Visalia. J.S. and Chucky were going to give Mayberry and Hall a ride to Visalia. Because Mayberry and Hall did not have anybody to buy drugs from in Visalia, they decided to go buy drugs from Lorenzo.

At some point, Hall, Mayberry, Chucky, and J.S. went to the Flats. Chucky was driving. It was dark. Mayberry gave Hall $20 to buy methamphetamines from Lorenzo. She went to Lorenzo's apartment, knocked on the metal security door, and said she was there "to buy 20." Lorenzo invited her to come in; she entered and gave Lorenzo the money. Lorenzo went to the kitchen and had his back turned, and then Bridget, "the female[,] started screaming."

8

Hall turned around and saw two masked people behind her. She was pretty sure one of them was Mayberry, because the person was very tall and African American. The other person was substantially shorter and was physically similar to Chucky. Mayberry had entered the apartment and was pointing a gun at the back of Lorenzo's head. Chucky never entered the apartment.

Hall grabbed Bridget by the hair and told her to stop screaming. When Hall turned back around, she saw Lorenzo's "legs laying in the kitchen." She did not hear a gunshot or see Lorenzo fall to the ground. Mayberry told Hall to grab the purse and the camouflage bag with "weed in it." Hall did not remember going through cupboards. She saw Lorenzo's body from the waist down and "went into shock." She ran out of the apartment to the car carrying the purse and camouflage bag and jumped into the back seat of the car.

Mayberry came back to the car, and they drove off with J.S. and Chucky. The next thing Hall remembered was waking up in Visalia. Chucky and J.S. dropped off Hall and Mayberry at Mayberry's father's apartment. Mayberry had the stolen property in "a blue bucket," which he brought into his father's apartment. Later in the day, while Mayberry and Hall were outside, the police arrived. Mayberry took off running towards the apartment, and the police chased him, but Hall did not see what happened next. They were both arrested.

Hall testified she did not know Mayberry to carry a gun. But Mayberry's cousin, Javonni T., did carry a gun. Javonni was about the same height as Mayberry.

Hall gave different versions of events to the police at different times. When she first talked to a detective she did not tell him it was Mayberry that fired the shot inside the apartment. She explained at trial that she was still

9

under the influence at that time and did not really remember. She admitted she did not tell the detective that Mayberry was the shooter until around a month after she was arrested.

E.    *Misty G.*

Misty G. is Hall's sister and lived with Hall on North Dearing Avenue with her 15-year old daughter, J.S. At the time of trial, J.S. was dating "[a] couple boys," one of whom was "Chucky." Hall was dating Mayberry. Misty had seen Mayberry at their house several times. He had stayed there overnight and kept his belongings there in an overnight bag.

The night before the murder, Misty hung out at the house with Mayberry and Hall for about an hour. All three of them used methamphetamines, and Misty also took Xanax. Mayberry and Hall were "saying something about getting money." They used the phrase "coming up," which means "to get something you don't got by means that are not necessarily . . . legal." Mayberry also used the term "lick," which can mean a job, or a robbery. Mayberry asked Misty to go with them. Misty said no; she had just gotten out of prison for grand theft auto and "was trying to not pull any licks right away."

Misty saw J.S. the night of September 17. J.S. was in and out of the house; Chucky was out front. Chucky drove a vehicle that Misty could tell had been stolen. Chucky drove Misty and J.S. to the store. When they got back to the house, Misty argued with J.S. "about her running around anymore that night in the car." Misty fell asleep on the couch. When Misty woke up the morning of September 18, she talked to Tiffany, who lived at the Flats, and found out there had been a shooting there. She learned the victim was Lorenzo. Misty had bought drugs from Lorenzo in the past. Later that

day, Misty saw J.S. at the home of one of Misty's sisters. J.S. was high. She was mumbling, "saying crazy things," and crying.

On September 18, after Mayberry was arrested, Mayberry's mother called Misty and asked her to find a bag that Mayberry had left at Hall's house. Misty found the bag at the foot of Hall's bed. She looked in one of the bag's side compartments and found an empty gun magazine. She threw the gun magazine away in the kitchen garbage can and put the bag on the front porch so Mayberry's family could come get it. When the police executed the search warrant at Hall's house, they found a magazine for a small caliber gun in the kitchen garbage can, and a bag on the front porch that contained a prescription bottle bearing Mayberry's name.

F.    *J.S.*

On September 19, a detective interviewed J.S. A recording of the interview was played for the jury. J.S. had been raised by her grandmother and had lived at the house on North Dearing Avenue all her life. On the night of September 17, Hall, Mayberry, and Chucky were hanging out at the house in Hall's room. J.S. described Chucky as a stocky "white guy" between 5'6" and 5'8" tall.

That night, J.S. was going in and out of Hall's room. She overheard Mayberry and Hall talking about "coming up on somebody." J.S. explained that "come up" meant "steal." At around midnight, J.S. took Xanax given to her by Hall and Mayberry.

In the early morning, she, Mayberry, Hall, and Chucky left the house in a gray car. Mayberry drove. J.S. did not see Mayberry with a gun that night, but she had seen him with a gun before. Mayberry parked the car near the gate of an apartment complex. Hall, Mayberry, and Chucky got out, leaving J.S. behind in the car. About five minutes later, J.S. saw Hall

11

running to the car with "stuff throwing in her hand." She also saw Mayberry and Chucky "running out." Mayberry opened the trunk of the car and "was helping [Hall] throw the [stuff] in."

Mayberry got in the car and started driving. Mayberry said "he shot the guy in his head, and then he shot the girl." J.S. told the detective, "[Mayberry] was like, 'I shot that nigga in his head, and he just fell down like that.' And he said he had a pile of blood. . . . 'I was telling that bitch, bitch, I know where you live, bitch.' And then he's like, just to show you that, like, I'm down or whatever, that he shot her, too." Mayberry then said he was getting "outta town" and that "his dad lived in Visalia." Mayberry drove to Visalia, where he and Hall got out of the car. J.S. told the detective the "guy that they shot" was "Red." J.S. had met "Red" before; he was a friend of Hall's.

At trial, J.S. testified she did not remember going anywhere with Mayberry on September 18. She took "a lot of Xanax," drank alcohol and used marijuana the night of September 17. She remembered "chilling" with Mayberry and Hall for about an hour, but she did not remember what happened next. She denied knowing what "coming up" meant. She did not remember a shooting. She did not remember what she said in her tape-recorded interview with the detective on September 19.

G.    *Mayberry*

In a recorded jail call, Mayberry asked his mother to delete two Gmail accounts. The investigating detectives were able to identify a cell phone associated with these Gmail accounts. They obtained data showing the cell phone's approximate location on September 18. From 3:59 a.m. until 5:38 a.m., the cell phone was in the area of Lorenzo's apartment complex. At 7:44 a.m., the cell phone was in the area of the Kingsburg gas station. From

12

8:31 a.m. until 6:12 p.m., the cell phone was in Visalia in the area of Mayberry's father's apartment.

In recorded jail calls to his mother, Mayberry also appeared to blame either Hall or Bridget for his arrest. He said he was going to have "that bitch gone" and he "already got it planned."

J.S. told a detective that Mayberry was wearing a white tee-shirt the morning of September 18, and she saw blood spatter on his tee-shirt after he ran back to the car from Lorenzo's apartment. She saw Mayberry take the shirt off as they drove away. When Mayberry was arrested, he was wearing a red sweater. Hall identified the sweater as one of the items they stole from Lorenzo's apartment.

When Mayberry was arrested, he had a cut on his left thumb. A towel with apparent blood stains was discovered inside the blue bin in Mayberry's father's apartment. Genetic testing of one of these stains revealed its genetic profile to be the same as Mayberry's.

At trial, the defense rested without calling witnesses or presenting evidence.

## II.

### *Verdict and Sentencing*

The jury convicted Mayberry of first degree murder with a robbery-murder special circumstance and found true he personally and intentionally discharged a firearm in committing the murder. (§§ 187, subd. (a), 190.2, subd. (a)(17), 12022.53, subd. (d); count 1.) The jury convicted Mayberry of first degree residential robbery (§ 211; count 2) and assault with a firearm with the allegation he personally inflicted great bodily injury (§§ 245, subd. (a)(2), 12022.7, subd. (a); count 3).

13

Mayberry waived his right to a jury trial on allegations he suffered a 2012 robbery conviction that qualified as a prior strike (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and a prior prison term (former § 667.5, subd. (b)). In a bifurcated bench trial, the court found the priors allegations true beyond a reasonable doubt.

At the sentencing hearing, the trial court declined to strike the prior conviction and declined to strike the section 12022.53 enhancement. On count 1, the court imposed a sentence of life without the possibility of parole, enhanced by an indeterminate term of 25 years to life under section 12022.53, subdivision (d). The court imposed a one-year consecutive term for the prior prison term pursuant to former section 667.5, subdivision (b). On count 2, the court imposed a determinate term of 12 years (consisting of the low term of six years, doubled for the strike prior under section 667, subdivision (e)(1)) but stayed this term pursuant to former section 654. On count 3, the court imposed a determinate term of 11 years (consisting of the low term of four years, doubled to eight for the strike prior under section 667, subdivision (e)(1), plus three years for the great bodily injury enhancement under section 12022.7, subdivision (a)). The total aggregate sentence consisted of a 12-year determinate term (a total of 11 years on count 3 plus the one year prior prison term enhancement), followed by an indeterminate term of 25 years to life, consecutive to an indeterminate term of life without the possibility of parole.

DISCUSSION

I.

*Any Error in Modifying CALCRIM No. 376 to Refer to Nontheft Offenses*

*Was Harmless*

Mayberry contends the trial court erred in instructing the jury with the following modified version of CALCRIM No. 376:

> "If you conclude that the defendant knew he possessed property and you conclude that the property had in fact been recently stolen, you may not convict the defendant of Murder, Robbery and assault with a firearm based on those facts alone. However, if you also find that supporting evidence tends to prove his guilt, then you may conclude that the evidence is sufficient to prove he committed Murder, Robbery and assault with a firearm.

> "The supporting evidence need only be slight and need not be enough by itself to prove guilt. You may consider how, where, and when the defendant possessed the property, along with any other relevant circumstances tending to prove his guilt of Murder, Robbery and assault with a firearm.

> "Remember that you may not convict the defendant of any crime unless you are convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt."

First, Mayberry contends the instruction misled jurors to convict him on an alternate, legally erroneous theory of guilt, one that did not involve a determination that the elements of the charged offenses were true beyond a reasonable doubt. Second, he contends the trial court erred by modifying the instruction to say that murder and assault with a firearm were crimes to which the instruction's permissible inference applied. "We review de novo whether a jury instruction correctly states the law. [Citation.] Our task is to determine whether the trial court ' "fully and fairly instructed on the applicable law." ' " (*People v. Lopez* (2011) 198 Cal.App.4th 698, 708 (*Lopez*).) Doing so, we reject Mayberry's first challenge to CALCRIM No. 376 but agree

15

the court erred in modifying the instruction to include the two nontheft offenses. However, we conclude the error was not prejudicial.[4]

A.    *CALCRIM No. 376 Did Not Create a Legally Erroneous Theory of Guilt*

Mayberry's first claim of instructional error challenges the language of the CALCRIM No. 376 pattern instruction. He contends a reasonable juror would interpret CALCRIM No. 376 to mean "if you find beyond a reasonable doubt that the defendant possessed recently stolen property, and beyond a reasonable doubt that there was some other 'supporting evidence' that he was involved in the crime, then you may conclude that he is guilty." Mayberry argues such a juror would be misled to convict him based only on these two findings, without determining whether the prosecution proved every element of the charged offenses beyond a reasonable doubt, in violation of his rights under the Fourteenth Amendment. We disagree.

" ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248 (*Musselwhite*).) " 'If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' " (*People v. Young* (2005) 34 Cal.4th 1149, 1202.) " ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " (*People v. Ramos*

_____

[4]    Although Mayberry did not object to this instruction, there is no forfeiture of an instructional issue on appeal where, as here, the appellant asserts the instructional error violated his substantial constitutional rights. (*People v. Smithey* (1999) 20 Cal.4th 936, 976–977, fn. 7.)

(2008) 163 Cal.App.4th 1082, 1088 (*Ramos*).) " ' "We credit jurors with intelligence and common sense [citation] and do not assume that these virtues will abandon them when presented with a court's instructions." ' " (*Lopez, supra,* 198 Cal.App.4th at p. 710.)

CALCRIM No. 376, like its predecessor CALJIC 2.15,[5] "is based on a 'long-standing rule of law [that] allows a jury to infer guilt of a theft-related crime from the fact a defendant is in possession of recently stolen property when coupled with slight corroboration by other inculpatory circumstances [that] tend to show guilt.' " (*Lopez, supra,* 198 Cal.App.4th at p. 709, quoting *People v. Barker* (2001) 91 Cal.App.4th 1166, 1173 (*Barker*); see *People v. McFarland* (1962) 58 Cal.2d 748, 754 ["[p]ossession of recently stolen property is so incriminating that to warrant conviction there need only be, in addition to possession, slight corroboration in the form of statements or conduct of the defendant tending to show his guilt"].) "For centuries courts have instructed juries that an inference of guilty knowledge may be drawn from the fact of unexplained possession of stolen goods." (*Barnes v. United States* (1973) 412 U.S. 837, 843.) This inference is permissive, not

---

5    CALJIC 2.15 states: "If you find that a defendant was in [conscious] possession of recently [stolen] [extorted] property, the fact of that possession is not by itself sufficient to permit an inference that the defendant is guilty of the crime of [ ]. Before guilt may be inferred, there must be corroborating evidence tending to prove defendant's guilt. However, this corroborating evidence need only be slight, and need not by itself be sufficient to warrant an inference of guilt. [¶] As corroboration, you may consider [the attributes of possession--time, place and manner,] [that the defendant had an opportunity to commit the crime charged,] [the defendant's conduct,] [[his] [her] false or contradictory statements, if any,] [and] [or] [other statements [he] [she] may have made with reference to the property] [a false account of how [he] [she] acquired possession of the stolen property] [any other evidence which tends to connect the defendant with the crime charged]."

17

mandatory.  (*People v. Synder* (2003) 112 Cal.App.4th 1200, 1226.)  In *Barnes*, the United States Supreme Court held this inference comports with due process if "the evidence necessary to invoke the inference is sufficient for a rational juror to find the inferred fact beyond a reasonable doubt."  (*Barnes*, at p. 843.)

The California Supreme Court has repeatedly upheld CALJIC No. 2.15 against challenges that it alters or lowers the prosecution's burden of proof in violation of the Fourteenth Amendment.  (See, e.g., *People v. Grimes* (2016) 1 Cal.5th 698, 730 (*Grimes*); *People v. Moore* (2011) 51 Cal.4th 1104, 1111–1112, 1130 (*Moore*); *People v. Gamache* (2010) 48 Cal.4th 347, 375–376 (*Gamache*); *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 189; *People v. Parson* (2008) 44 Cal.4th 332, 355–356; *People v. Holt* (1997) 15 Cal.4th 619, 676–677 (*Holt*); *People v. Johnson* (1993) 6 Cal.4th 1, 36–38 (*Johnson*), overruled on another ground by *People v. Rogers* (2006) 39 Cal.4th 826, 878–879.)  Courts of Appeal, relying on these decisions, have rejected similar constitutional challenges to CALCRIM No. 376, reasoning CALCRIM No. 376 is substantially similar to CALJIC No. 2.15.  (*People v. O'Dell* (2007) 153 Cal.App.4th 1569, 1574–1575; accord *Lopez*, *supra*, 198 Cal.App.4th at p. 709; see *People v. Solorzano* (2007) 153 Cal.App.4th 1026, 1036 ["The permissive inference that CALCRIM No. 376 authorizes . . . is linguistically synonymous with, and constitutionally indistinguishable from, the permissive inference that CALJIC No. 2.15  authorizes[.]"].)

Mayberry contends his challenge to CALCRIM No. 376 is not foreclosed by California Supreme Court authority rejecting challenges to CALJIC No. 2.15 for two reasons.  First, he claims the challenge he raises is one the California Supreme Court has not considered.  He is incorrect.  In *Grimes*, the California Supreme Court considered an argument by the defendant that

18

CALJIC No. 2.15 "gave the jury an option of convicting him of robbery based on his possession of stolen goods plus some corroborating evidence, without finding all the elements of robbery." (*Grimes*, *supra*, 1 Cal.5th at p. 730.) Our high court rejected this argument and held "CALJIC No. 2.15 appropriately permits—but does not require—jurors to infer guilt of burglary, robbery, or theft from the possession of stolen property plus some corroborating evidence, and that it does not violate due process or reduce the burden of proof." (*Ibid.*) The instructional challenge Mayberry raises here is indistinguishable from the argument raised and rejected in *Grimes*.

Second, Mayberry argues California Supreme Court decisions rejecting challenges to CALJIC No. 2.15 (such as *Grimes*) are not controlling, because contrary to the conclusions of other Courts of Appeal, CALCRIM No. 376 is not substantially similar to CALJIC No. 2.15. He argues: "CALCRIM No. 376 was the only jury instruction that used the words 'conclude' or 'conclusion.'" According to Mayberry, the repeated appearance of these words in the instruction would cause a reasonable juror to misinterpret the phrase, " 'each fact essential to the *conclusion* that the defendant is guilty' " in the last paragraph of the instruction, to refer back to the two " 'facts' " in the first paragraph of the instruction relating to (1) possession of stolen property, and (2) supporting evidence tending to prove his guilt. He argues CALCRIM No. 376 thus created an alternate theory of guilt based on "two 'essential facts' instead of upon proof of each statutory element of the offenses."

Mayberry's argument fails because it relies on an unreasonable interpretation of CALCRIM No. 376 and disregards other relevant instructions. " ' "We credit jurors with intelligence and common sense [citation] and do not assume that these virtues will abandon them when

19

presented with a court's instructions." ' " (*Lopez*, *supra*, 198 Cal.App.4th at p. 710.) " ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " (*Ramos*, *supra*, 163 Cal.App.4th at p. 1088.) In addition to CALCRIM No. 376, the jury was also instructed that "[w]ords and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings." "[C]onclude" and "conclusion," the words Mayberry claims jurors would have found misleading, are ordinary words that are synonymous with *find* and *finding*. They are not uniquely legal terminology, and the instruction gives them no special definition. It is not reasonably likely that an intelligent juror encountering the words "conclude" and "conclusion" would give them undue emphasis or construe them in the hypertechnical manner Mayberry suggests.

Nor did the instruction's use of these words make the last paragraph of the instruction amenable to the interpretation jurors could convict Mayberry based only on the findings in the first paragraph of the instruction, without considering other relevant instructions. We assume jurors are " ' "capable of understanding *and correlating* all jury instructions which are given." ' " (*Ramos*, *supra*, 163 Cal.App.4th at p. 1088, italics added.) Here, in addition to CALCRIM No. 376, the jury was also instructed on the elements of the charged offenses pursuant to CALCRIM No. 521 (First Degree Murder), CALCRIM No. 540A (Felony Murder), CALCRIM No. 1600 (Robbery), and CALCRIM No. 875 (Assault With a Deadly Weapon—Firearm). The jury was "expressly told that in order to prove those crimes, each of the elements must be proved." (*Holt*, *supra*, 15 Cal.4th at p. 677.) The jury was also instructed

20

pursuant to CALCRIM No. 200 to "[p]ay careful attention to all of these instructions and consider them together." We see no reasonable likelihood that a jury so instructed, upon being reminded by CALCRIM No. 376 that they "may not convict the defendant of any crime unless you are convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt," would believe they could ignore the instructions on the elements of the charged offenses and convict Mayberry without considering whether the prosecution had proved those elements beyond a reasonable doubt.

For these reasons, we reject Mayberry's first challenge to CALCRIM No. 376.

B.   *The Trial Court Erred in Including Nontheft Offenses in CALCRIM No. 376, But the Error Was Not Prejudicial*

For his second claim of instructional error, Mayberry contends the court erred by modifying CALCRIM No. 376 to include the nontheft offenses of murder and assault with a firearm. We agree this was error but conclude the error was not prejudicial.

It is well established that CALCRIM No. 376 should be limited to theft or theft-related offenses and should not be modified to refer to nontheft charges like murder or assault. (See Bench Notes to CALCRIM No. 376 (2022 ed.) p. 149 ["Use of this instruction should be limited to theft and theft-related crimes."], citing *People v. Prieto* (2003) 30 Cal.4th 226, 248–249 (*Prieto*) [error to instruct jurors the permissive inferences in CALJIC No. 2.15 apply to rape and murder]; *Moore, supra*, 51 Cal.4th at p. 1130 [error to modify CALJIC No. 2.15 to refer to murder charge]; *Gamache, supra*, 48 Cal.4th at pp. 374–375 [same]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 16, 101 [error to instruct jurors the permissive inferences in CALJIC No. 2.15 applied to the " 'crimes alleged,' " which included murder

21

and forcible sodomy].)  Discussing CALJIC No. 2.15, the California Supreme Court has stated it has "approved the use of [the instruction] with respect to theft offenses because, '[w]ith the inference from the knowledge and conscious possession of [stolen] property, and slight additional evidence as corroboration, the intent to steal, identity, and the determination a defendant committed the acts necessary to constitute robbery and burglary have been found to naturally and logically flow[.]' " (*Prieto, supra,* 30 Cal.4th at p. 249, quoting *Barker, supra,* 91 Cal.App.4th at p. 1176, fn. 6.)  But "[t]he same is not true for nontheft offenses like rape or murder." (*Prieto,* at p. 1176.) " '[P]roof a defendant was in conscious possession of recently stolen property simply does not lead naturally and logically to the conclusion the defendant committed' a rape or murder." (*Ibid.*)  Likewise, proof a defendant was in conscious possession of recently stolen property does not lead naturally and logically to the conclusion the defendant committed an assault with a firearm.

The People, relying on this court's decision in *People v. Harden* (2003) 110 Cal.App.4th 848 (*Harden*), contend the trial court did not commit instructional error.  The defendant in *Harden* was charged with robbery, burglary, and murder with a special circumstance allegation the murder was committed in the commission of a robbery or a burglary. (*Id.* at p. 851.)  The trial court modified CALJIC No. 2.15 to tell the jury the permissive inference arising from the defendant's conscious possession of recently stolen property applied to the "crimes of robbery and burglary . . . and . . . the allegations . . . that the murder of [the victim] was committed by the defendant during the commission of the crimes of robbery and burglary." (*Id.* at p. 855, italics omitted.)  We found the modification was not erroneous. (*Id.* at pp. 856–859.) We observed that "[a]lthough the published cases to date have approved

22

CALJIC No. 2.15 for use regarding theft-related *offenses*, there appears to be no valid reason to preclude its use regarding theft-related *allegations*." (*Id.* at p. 857.) We reasoned that "[b]ecause CALJIC No. 2.15 may properly be given as a cautionary instruction regarding the offenses of robbery and burglary [citation], it logically also may properly be given as a cautionary instruction regarding allegations that include as elements the offenses of robbery or burglary." (*Ibid.*)

*Harden* is distinguishable from this case. Here, unlike *Harden*, the trial court did not modify CALCRIM No. 376 to refer to the special circumstance allegation the murder was committed during the commission of the crime of robbery. (See *Harden, supra,* 110 Cal.App.4th at p. 855.) Rather, it modified the instruction to refer to the crime of murder itself. Moreover, neither the holding nor reasoning of *Harden* supports instructing the jury that the permissive inference relating to conscious possession of stolen property applies to assault with a firearm. Accordingly, we conclude the trial court erred by modifying CALCRIM No. 376 as it did.

Turning to the question of prejudice, the California Supreme Court has repeatedly held that instructional error of this sort does not violate the federal Constitution but rather is error under state law only, and that it must be evaluated for prejudice under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), not *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*People v. Parker* (2022) 13 Cal.5th 1, 69–70; *Moore, supra,* 51 Cal.4th at p. 1130; *Gamache, supra,* 48 Cal.4th at p. 376; *Prieto, supra,* 30 Cal.4th at p. 249.) Mayberry nevertheless maintains we must review the error under the *Chapman* standard. He observes the jury was

instructed on accomplice testimony pursuant to CALCRIM No. 335,[6] and contends the combination of this instruction and the erroneously modified CALCRIM No. 376 "lowered the burden of proof and allowed the jury to convict [him] without finding each element beyond a reasonable doubt," resulting in federal constitutional error.

We disagree that the combination of these instructions resulted in a violation of the federal Constitution. First, the erroneous modification of CALCRIM No. 376 did not lower the burden of proof or infringe on Mayberry's federal constitutional rights. As our high court has explained, "[b]ecause permissive inferences, as opposed to mandatory inferences, do not *require* that the jury reach a certain finding based on a predicate fact, the prosecution's burden of persuasion is improperly diminished only if the permissive inference is irrational." (*Moore*, *supra*, 51 Cal.4th at p. 1131.) In *Moore*, our high court held the permissive inference arising from possession of recently stolen goods is not irrational even when applied to nontheft offenses. (*Id.* at p. 1132.) Thus, the trial court's erroneous addition of murder and assault with a firearm to CALCRIM No. 376 did not lower the burden of proof on these offenses, and for the reasons we have already

---

[6]    As given in this case, CALCRIM No. 335 stated in relevant part: "You may not convict the defendant of [murder or robbery or assault with a firearm] based on the statement or testimony of an accomplice alone. You may use the statement or testimony of an accomplice to convict the defendant only if: [¶] 1. The accomplice's statement or testimony is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the accomplice's statement or testimony; [¶] AND [¶] 3. That supporting evidence tends to connect the defendant to the commission of the crime. [¶] Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact about which the witness testified."

explained, it also did not allow the jury to convict him of these offenses without finding each element had been proved beyond a reasonable doubt.

Second, Mayberry does not argue or cite any authority for the proposition that CALCRIM No. 335 lowers or alters the prosecutor's burden of proof. Nor does he cite any authority for the proposition that giving an erroneously modified CALCRIM No. 376 instruction in combination with CALCRIM No. 335 creates federal constitutional error. We disagree that giving these two instructions together violates the Constitution when neither of them does so independently. As we have discussed, when considering claims of instructional error, we evaluate " ' "the entire charge of the court" ' " (*Musselwhite*, *supra*, 17 Cal.4th at p. 1248) and " ' "assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given" ' " (*Ramos*, *supra*, 163 Cal.App.4th at p. 1088). The jury was instructed on the elements of the charged offenses pursuant to CALCRIM No. 521 (First Degree Murder), CALCRIM No. 540A (Felony Murder), CALCRIM No. 1600 (Robbery), and CALCRIM No. 875 (Assault With a Deadly Weapon—Firearm), and it was instructed pursuant to CALCRIM No. 200 to "[p]ay careful attention to all of these instructions and consider them together." We see no possibility a jury receiving all of these instructions would focus on CALCRIM No. 335 and CALCRIM No. 376 to the exclusion of all other relevant instructions, and convict Mayberry without finding the prosecution proved each element of the offenses of conviction beyond a reasonable doubt.

Therefore, the trial court's instructional error "is one of state law only, subject to the miscarriage of justice test under [*Watson*, *supra*, 46 Cal.2d at p. 836]—whether defendant has established there exists a reasonable probability he would have obtained a more favorable result if the error had

25

not occurred." (*Moore*, *supra*, 51 Cal.4th at p. 1130, citing *Gamache*, *supra*, 48 Cal.4th at p. 376.) Applying the *Watson* standard here, we easily conclude the error was harmless.

The evidence of Mayberry's guilt was overwhelming, even without the evidence of his possession of items stolen from Lorenzo and Bridget. Before the robbery and murder, Misty and J.S. overheard Mayberry and Hall discuss they were going to "come up," meaning steal. Hall and J.S. both stated Mayberry drove them to Lorenzo's apartment complex the morning of September 18. Mayberry's physical build matched Bridget's description of the person who shot her and Lorenzo. Hall's testimony established that Mayberry was the shooter. J.S. observed Mayberry in the aftermath of the crimes, and said she saw blood spatter on his white tee-shirt. Mayberry confessed to J.S. and Hall that he shot both victims. Data obtained through Mayberry's Gmail accounts confirmed a cell phone linked to both of his Gmail accounts was in the area of Lorenzo's apartment when the crimes took place. Mayberry was captured on surveillance video at the Kingsburg gas station in the getaway vehicle, and he admitted he was at the gas station at the precise time the video was recorded. His fingerprint was found on the getaway vehicle. An empty gun magazine was discovered in a bag that also contained prescription medicine bearing Mayberry's name. Although there was testimony Javonni was physically similar to Mayberry, no evidence placed Javonni at the scene of the crime. In short, even if one ignores evidence of Mayberry's possession of the stolen property, abundant evidence established his guilt on all counts of conviction, including first degree murder on a felony murder theory and assault with a firearm.

Further still, the prosecutor did not emphasize the erroneously modified instruction in his closing arguments to the jury. He referred to

CALCRIM No. 376 only once. Mayberry points to a part of the prosecutor's rebuttal argument in which he referred to Mayberry having blueberry pie "in his hair" or "in his hands," and told the jury Mayberry "ate that pie." Mayberry contends this "pie" analogy referred to, and thus unduly emphasized, the inference of guilt arising from his possession of stolen items. His reading of the record is incomplete. The prosecutor was summarizing a variety of items of circumstantial evidence of Mayberry's guilt, only some of which related to his possession of stolen property. The prosecutor, by using this analogy, did not compound the trial court's instructional error.

On this record, there is no reasonable probability Mayberry would have received a more favorable result at trial if the court had not erroneously modified CALCRIM No. 376 to refer to murder and assault with a firearm. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

II.

*Mayberry's Eighth Amendment Challenge to the Felony-Murder Special Circumstance Fails*

Next, Mayberry contends the felony-murder special circumstance in section 190.2, subdivision (a)(17), violates the Eighth Amendment to the United States Constitution. He argues "[b]y making all felony murderers eligible for death, section 190.2[, subdivision (a)(17)] fails to serve the narrowing function which it is constitutionally required to perform."

As he acknowledges, however, the California Supreme Court has repeatedly rejected this same contention, and has instead upheld the felony-murder special circumstance as providing a meaningful basis for narrowing death eligibility. (See, e.g., *People v. Capers* (2019) 7 Cal.5th 989, 1012–1013 [reiterating the "well-established" holding that the " 'special circumstances listed in section 190.2 that render a murderer eligible for the death penalty,

27

which include felony murder and lying in wait, are not so numerous and broadly interpreted that they fail to narrow the class of death-eligible first degree murderers as required by the Eighth and Fourteenth Amendments' "]; *People v. Brooks* (2017) 3 Cal.5th 1, 114–115 [source of the holding reiterated in *Capers*]; *People v. Covarrubias* (2016) 1 Cal.5th 838, 934 [the felony-murder special circumstance is constitutional]; *People v. Boyce* (2014) 59 Cal.4th 672, 700 [same]; *Musselwhite, supra,* 17 Cal.4th at pp. 1265–1266 [same].) We are required to follow these decisions, which foreclose his challenge. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

III.

*We Shall Remand for Resentencing in Accordance with Two Recent Amendments to the Penal Code*

Mayberry's remaining challenges to the judgment consist of three claims of sentencing error. The first and second challenges based on recent amendments to the Penal Code have merit, but the third challenge has been forfeited.

A.      *The One-Year Term Imposed Under Section 667.5 Shall Be Stricken*

First, Mayberry contends the one-year prior prison term enhancement imposed by the trial court pursuant to former section 667.5, subdivision (b), must be stricken in light of Senate Bill No. 136 (2019–2020 Reg. Sess.) (Senate Bill 136), which amended former section 667.5, subdivision (b), effective January 1, 2020. (See *People v. Lopez* (2019) 42 Cal.App.5th 337, 341.) "Prior to this amendment, the statute provided for a one-year enhancement for each prior separate prison term, unless the defendant remained free from both prison custody and the commission of a new felony for a five-year period after discharge. [Citations.] After the amendment, 'a

28

one-year prior prison term enhancement will only apply if a defendant served a prior prison term for a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b).' " (*People v. Gastelum* (2020) 45 Cal.App.5th 757, 772 (*Gastelum*).)

The People concede Mayberry is entitled to the benefits of Senate Bill 136 and his one-year prior prison term sentence enhancement must be stricken. We agree. It is settled the statutory amendment effected by Senate Bill 136 is ameliorative and applies retroactively to nonfinal judgments under the rule of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*). (See, e.g., *People v. Winn* (2020) 44 Cal.App.5th 859, 872; *Gastelum*, *supra*, 45 Cal.App.5th at p. 772.) Mayberry's judgment remains nonfinal on appeal. Because his prior prison term was for a robbery conviction (§ 211), not a sexually violent offense, he cannot be sentenced to a one-year term under the current version of section 667.5, subdivision (b). The enhancement must be stricken. (See *Gastelum*, at p. 773.)

Ordinarily, when "an enhancement is erroneously imposed and the trial court has already imposed the maximum possible sentence, a remand for resentencing is unnecessary" and "[w]e may simply strike the enhancement and affirm the judgment as modified." (*Gastelum*, *supra*, 45 Cal.App.5th at p. 773.) However, that course has been altered by another new statutory provision enacted while Mayberry's appeal was pending, Senate Bill No. 483 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 728, § 1) (Senate Bill 483). Senate Bill 483 added former section 1171.1 to the Penal Code. (Stats. 2021, ch. 728, §§ 1, 2.) Effective June 30, 2022, former section 1171.1 was renumbered as section 1172.75. (Stats. 2022, ch. 58, §12.) We refer to the new provision as recently renumbered.

29

Section 1172.75 provides that "[a]ny sentence enhancement that was imposed prior to January 1, 2020, pursuant to subdivision (b) of Section 667.5, except for any enhancement imposed for a prior conviction for a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code is legally invalid." (§ 1172.75, subd. (a).) It requires recall of sentence and resentencing of all persons in custody serving a term for a judgment that includes the repealed enhancement. (§ 1172.75, subds. (b), (c).) It contains procedures and deadlines for recall of sentence and resentencing of all such persons. (§ 1172.75, subds. (b)–(e).) The latest deadline for resentencing is December 31, 2023. (§ 1172.75, subd. (c)(2).)

The new law also sets out specific instructions for any such resentencing. (§ 1172.75, subds. (d)–(e).) These include the following. First, "[r]esentencing pursuant to this section shall result in a lesser sentence than the one originally imposed as a result of the elimination of the repealed enhancement, unless the court finds by clear and convincing evidence that imposing a lesser sentence would endanger public safety. Resentencing pursuant to this section shall not result in a longer sentence than the one originally imposed." (§ 1172.75, subd. (d)(1).) Second, at the resentencing hearing, the court "shall apply the sentencing rules of the Judicial Council and apply any other changes in law that reduce sentences or provide for judicial discretion so as to eliminate disparity of sentences and to promote uniformity of sentencing." (§ 1172.75, subd. (d)(2).) Third, the court "may consider postconviction factors, including, but not limited to, the disciplinary record and record of rehabilitation of the defendant while incarcerated, evidence that reflects whether age, time served, and diminished physical condition, if any, have reduced the defendant's risk for future violence, and evidence that reflects that circumstances have changed since the original

30

sentencing so that continued incarceration is no longer in the interest of justice." (§ 1172.75, subd. (d)(3).) Fourth, "Unless the court originally imposed the upper term, the court may not impose a sentence exceeding the middle term unless there are circumstances in aggravation that justify the imposition of a term of imprisonment exceeding the middle term, and those facts have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1172.75, subd. (d)(4).)

In a supplemental brief, Mayberry argues that simply striking the one-year enhancement imposed under the repealed portion of former section 667.5, subdivision (b), without remanding to the trial court for resentencing, would deprive him of his right to resentencing pursuant to the changes in the law that resulted from the enactment of Senate Bill 483. The People do not address this position in their responsive supplemental brief. We agree with Mayberry that he is statutorily entitled to be resentenced under section 1172.75. The plain language of the statute makes recall of sentence and resentencing of all persons in his circumstance mandatory. Consequently, we will strike the one-year prior prison term enhancement and remand the matter for resentencing under section 1172.75.

B.  *The Trial Court Did Not Exercise Its Sentencing Discretion Under Section 654, as Amended by Assembly Bill No. 518; We Are Compelled by the Mandatory Resentencing Provisions of Section 1172.75 to Remand for Resentencing on This Ground*

Next, in supplemental briefing, Mayberry contends he is entitled to be resentenced in accordance with Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Assembly Bill 518). Effective January 1, 2022, Assembly Bill 518 amended section 654 to provide in relevant part, "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under

31

more than one provision." (Stats. 2021, ch. 441, § 1, italics added.) Previously, under section 654, "the sentencing court was required to impose the sentence that 'provides for the longest potential term of imprisonment' and stay execution of the other term." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379 (*Mani*); *People v. Jones* (2022) 79 Cal.App.5th 37, 45 (*Jones*).) "As amended by Assembly Bill 518, . . . section 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*Mani*, at p. 379.)

The trial court, applying the former version of section 654, imposed and executed a term of life without the possibility of parole on count 1 (first degree felony murder of Lorenzo), enhanced by an indeterminate sentence of 25 years to life under section 12022.53, subdivision (d), and imposed a determinate term of 11 years on count 3 (assault with a firearm on Bridget), while imposing but staying a determinate term of 12 years on count 2 (first degree robbery of Lorenzo and Bridget). The parties agree the discretion newly conferred by Assembly Bill 518 alters the court's options with regard to which of these sentences to stay or execute. In addition, the People concede this amendment to section 654 applies retroactively to Mayberry, as the amendment is ameliorative and his judgment was not final when it became effective. Their concession is well taken. (See, e.g., *Mani*, *supra*, 74 Cal.App.5th at p. 379 [Assembly Bill 518 applies retroactively to all nonfinal judgments under the *Estrada* rule]; *Jones*, *supra*, 79 Cal.App.5th at p. 45 [same].)

Ordinarily, remand is the appropriate course when retroactive changes in law affect the sentencing court's discretion. This is so because " '[d]efendants are entitled to sentencing decisions made in the exercise of the

"informed discretion" of the sentencing court' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 (*Gutierrez*)), and " 'a court that is unaware of its discretionary authority cannot exercise its informed discretion.' " (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.) An exception to this requirement exists, however, in the circumstance where " the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*Gutierrez*, at p. 1391.) When " ' "the record shows that the trial court would not have exercised its discretion even if it believed it could do so, then remand would be an idle act and is not required." ' " (*McDaniels*, at p. 425; see *People v. Flores* (2020) 9 Cal.5th 371, 431–432 (*Flores*) [holding remand to resentence defendant to exercise sentencing discretion conferred by statutory amendment would be an idle act]; *People v. Jones* (2019) 32 Cal.App.5th 267, 273–274 [same]; *People v. McVey* (2018) 24 Cal.App.5th 405, 419 [same].)

Here, the parties dispute whether a remand for resentencing is necessary. The People contend it is apparent from the trial court's statements at sentencing that a remand to exercise its discretion under the amended version of section 654 would be an idle act. At the sentencing hearing, the trial court recognized it had "discretion pursuant to *Romero*," discretion "pursuant to [section] 12022.53[, subdivision (d)] to strike" the enhancement, and "would have discretion concerning striking any of the special circumstances and discretion concerning any other related sentencing matters." The court stated: "However, given the facts and circumstances of this case -- [the prosecutor] described it as tragic. The court agrees. . . . [I]t's tragic any time someone loses a life. The los[s] of life here was made more so only by the actions of Mr. Mayberry. It's also tragic that he's a young man. And the sentence will require he serve the rest of his life in prison." The

33

court said it could not ignore "the related shooting of the young woman who was present at the time which could be described as both call[o]us if not torture against her to try to get her to give up the location of the drugs," or Mayberry's "post offense conduct, including comments that he may have taken other actions concerning other individuals who were witnesses or involved, including killing them." The court stated it was "clear that Mr. Mayberry[ ] . . . was the cause of the tragedy and would continue to be so should he be released. For those reasons I'm not exercising any of the discretion noted." At the end of the hearing, after imposing sentence, the court stated: "I know I'm repeating myself. I'm doing so intentionally. The court has done its best to consider every potential sentencing option, to consider every aspect in which I have to exercise my discretion. And I do not and would not impose any different sentence than the one imposed today." The People contend it is clear from the trial court's statements that it would have made the same sentencing decision even if it had possessed the discretion afforded by Assembly Bill 518 at the time of sentencing.

Mayberry acknowledges courts have denied resentencing when the record demonstrates with clarity how the court would exercise its discretion under a new enactment. However, he points out that he will be resentenced under section 1172.75 (as discussed *ante*), and the statutory instructions on resentencing (§ 1172.75, subds. (d)(1)–(4)) require the sentencing court to take reforms in the sentencing laws into account at the time of resentencing. He essentially contends a remand for resentencing in accordance with the newly-amended version of section 654 is required under the mandatory resentencing provisions of section 1172.75. The People do not respond to this argument in their supplemental responsive brief.

34

Mayberry's argument is not without merit.  Section 1172.75 includes the following provision governing resentencing of persons like Mayberry who are serving an invalid prior prison term enhancement imposed under the repealed portion of section 667.5, subdivision (b):  "The court *shall apply the sentencing rules of the Judicial Council and apply any other changes in law that reduce sentences* or provide for judicial discretion so as to eliminate disparity of sentences and to promote uniformity of sentencing."  (§ 1172.75, subd. (d)(2), italics added.)  Section 1172.75, subdivision (d)(2), by using the word "shall," makes consideration of "changes in law that reduce sentences" mandatory.  The change in discretion effected by the enactment of Assembly Bill 518 allows sentencing courts to execute the shorter prison sentence and stay the longer prison sentence, and thus it constitutes a change in law that "reduce[s] sentences."  (See § 1172.75, subd. (d)(2).)  The requirement in subdivision (d)(2) of section 1172.75 that at resentencing the court "*shall . . . apply any other changes in law that reduce sentences*" effectively requires the court to consider the discretion afforded by the newly amended version of section 654 at a resentencing proceeding conducted pursuant to section 1172.75.  We are required to follow the plain language of section 1172.75.  (See *People v. Boyd* (1979) 24 Cal.3d 285, 294.)

Moreover, the Legislature is presumed to be aware of "judicial decisions in effect at the time legislation is enacted."  (*People v. Overstreet* (1986) 42 Cal.3d 891, 897.)  In drafting Senate Bill 483 (which added former section 1171.1, now section 1172.75, to the Penal Code), the Legislature was presumably aware of the "idle act" exception articulated in such cases as *Flores*, *supra*, 9 Cal.5th at pages 431 through 432 and *Gutierrez*, *supra*, 58 Cal.4th at page 1391.  And yet the Legislature made no exceptions to the statutory resentencing mandate (or the related requirement the sentencing

35

court, at the time of resentencing, must apply changes in sentencing laws that reduce sentences) for the circumstance where the original sentencing court made clear it would not exercise its discretion to impose a different sentence. " ' " 'The courts may not speculate that the legislature meant something other than what it said. Nor may they rewrite a statute to make it express an intention not expressed therein.' " ' " (*People v. Burgio* (1993) 16 Cal.App.4th 769, 778.)

Under section 1172.75, the fact that Mayberry's sentence includes a now invalid one-year term imposed under the repealed portion of section 667.5, subdivision (b), entitles him to be resentenced. By operation of subdivision (d)(2) of section 1172.75, the resentencing proceeding must include consideration of the discretion newly afforded by the amended version of section 654. As the relevant statutory language is mandatory, we cannot deny resentencing on the ground urged by the People. Under this unique circumstance, we are compelled to remand for resentencing under section 654, as amended by Assembly Bill 518. Accordingly, we will do so.

C. *Mayberry Is Not Entitled to Have the Trial Court Reconsider Its Decision to Impose a 25-Year-to-Life Term Under Section 12022.53, Subdivision (d)*

Finally, on January 20, 2022, the California Supreme Court issued a decision in which it clarified that trial courts have discretion to impose a lesser included but uncharged firearm enhancement under section 12022.53, rather than the 25-year-to-life term mandated by subdivision (d). (*People v. Tirado* (2022) 12 Cal.5th 688, 692 (*Tirado*).) Mayberry argues he is entitled to be resentenced in light of this decision. The People respond that Mayberry forfeited this claim. We agree the matter has been forfeited.

The forfeiture doctrine "appl[ies] to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices."

(*People v. Scott* (1994) 9 Cal.4th 331, 353.) Thus, "complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal." (*Id.* at p. 356.) Here, Mayberry had the opportunity to raise, and thereby preserve, the discretionary sentencing choice he identifies. *People v. Morrison* (2019) 34 Cal.App.5th 217, which our high court approved of when it decided *Tirado*, was issued eight months before Mayberry was sentenced. (See *Tirado*, *supra*, 12 Cal.5th at p. 697 ["*Morrison* correctly described the scope of a trial court's sentencing discretion under section 12022.53."].) Mayberry could have relied on *Morrison* at his sentencing hearing to seek a lesser included firearm enhancement under section 12022.53, but he did not. (See *Morrison,* at p. 222.)

We conclude Mayberry forfeited this sentencing challenge. And because this sentencing issue does not arise from a "change[ ] in law" (see § 1172.75, subd. (d)(2)), Mayberry is not entitled to have the trial court reconsider its decision to sentence him to a term of 25 years to life under section 12022.53, subdivision (d), when he is resentenced.

## DISPOSITION

Mayberry's sentence is vacated and modified to strike the one-year prior prison term enhancement. The matter is remanded for resentencing

consistent with section 1172.75 and this opinion.  In all other respects, the judgment is affirmed.

DO, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.